UNITED STATES

v.

**Airman John G. LOUKAS, FR 573–45–2914 United States Air Force.**

**ACM 26543.**

U.S. Air Force Court of Military Review.

Sentence Adjudged 6 Aug. 1987.

Decided 16 Dec. 1988.

Appellate Counsel for the Appellant: Colonel Leo L. Sergi and Major William J. Reichart.

Appellate Counsel for the United States: Colonel Joe R. Lamport, Lieutenant Colonel Robert E. Giovagnoni and Lieutenant Colonel Morris A. Tanner, Jr.

Before LEWIS, BLOMMERS and KASTL, Appellate Military Judges.

### DECISION

LEWIS, Senior Judge:

The appellant was found guilty before a military judge, sitting alone, of related offenses, wrongful use of cocaine and incapacitation for performance of duties through prior wrongful indulgence in drugs. His sentence, as adjudged and approved, extends to a dishonorable discharge, confinement for eight months, forfeiture of all pay and allowances and reduction to airman basic. On appeal he challenges rulings by the military judge that denied his motions to suppress certain pretrial admissions and derivative urinalysis evidence. We conclude that the military judge erred in his rulings on the suppression motions, and we reverse.

We will first discuss the motion to suppress certain pretrial statements made by the appellant. The motion addressed two separate oral admissions of recent cocaine use made to a Staff Sergeant (SSgt) Dryer and a Captain Cottam, respectively. The appellant's admissions were made during the course of a C–130 aircraft mission in support of drug suppression efforts in South America.

The evidence developed during the suppression hearing was that the appellant was on temporary duty from Pope Air Force Base, North Carolina, along with other crew members. The appellant was the loadmaster. Following an overnight stay at Panama City, Panama, the appellant's crew was scheduled to depart Howard Air Force Base for an early morning flight to Trinidad, Bolivia, where they were to receive a load of unspecified cargo. The appellant was not present at the scheduled crew show time. When he finally arrived at the aircraft he was two hours late. The record, surprisingly, does not reflect that he received a particularly unfriendly or oth-erwise negative greeting from his fellow crew members, all of whom were senior in grade to him. The co-pilot kidded him about the number of ladies he had been with the evening before. SSgt Dryer recalled in his testimony that he teased the appellant about his lateness. Apparently none of the crew members, at that point, noted anything in the appellant's appearance or demeanor that was alarming.

After the aircraft had been in flight for four or more hours the assistant crew chief, an Airman First Class Taranto, stepped into the cargo section. The appellant was the only other person present in that portion of the plane. There was no cargo or equipment on board at that time. Airman Taranto testified that he observed that the appellant was acting in an irrational manner. He pointed in the direction of the flight deck and inquired of Airman Taranto, "Do you see them?" and, "Do you see her?" Airman Taranto did not see anyone. It was apparent to him that the appellant was experiencing a hallucination. The appellant handed Airman Taranto his survival vest and .38 calibre pistol and told him to take it (apparently referring to the firearm) and that he didn't want it. The witness reported the incident to his immediate superior, SSgt Dryer, the crew chief.

SSgt Dryer went to the back of the aircraft and confronted the appellant. He testified during the hearing on the motion to suppress that he noted that the appellant appeared to be nervous and that he was perspiring profusely even though it was cool in that portion of the plane. The appellant continued to hallucinate. Gesturing in the direction of the flight deck, he inquired why "those people" were there and wondered why "they" didn't just come down and get him. The witness stated that he asked the appellant if he had taken any drugs. The appellant responded that he had not. SSgt Dryer leaned over close to where the appellant was sitting so that he could observe his eyes and asked in a more insistent manner, "Come on, what have you taken?" or, "What are you on?" or words to that effect. The appellant replied that he had taken some cocaine the night be-

fore. SSgt Dryer asked, "Is that all?" He received an affirmative answer. SSgt Dryer advised that appellant to secure his seatbelt and relax. According to his testimony he was somewhat concerned for the safety of the aircraft and its flight crew, particularly if the appellant started "freaking out."

SSgt Dryer reported his observations of the appellant to the flight engineer, a Technical Sergeant Drummond. The latter went to the back of the aircraft and observed the appellant. He retrieved bullets that the appellant had on his person. He returned to the flight deck area and consulted with SSgt Dryer. They concluded that the situation was under control and that it would not be necessary to alert the aircraft commander, Captain Cottam. It was agreed that someone would maintain direct observation of the appellant during the remainder of the flight.

The aircraft landed at Trinidad, Bolivia, where it was to be loaded with equipment and supplies in support of Army personnel in the field. Captain Cottam went to the back of the aircraft to observe the uploading operation. He immediately observed that the appellant, who as loadmaster would normally play a major role in this operation, was not participating. The appellant was sitting with his head in his hands. Captain Cottam correctly concluded that he had a problem of some sort that needed to be resolved.

When Captain Cottam left the aircraft he encountered SSgt Dryer whom he queried concerning the appellant. SSgt Dryer reported that he thought the appellant was on drugs. According to Captain Cottam's testimony at trial, he did not take this remark seriously. Based on his observation of the appellant and his experience he believed that the appellant's condition was probably alcohol-related. In all likelihood, he thought, the appellant was feeling the effects of a hangover. He was concerned about the impact this incident might have on the morale and effectiveness of the crew at the beginning of a lengthy period of temporary duty. He was determined to speak to the appellant and attempt to get the problem resolved before the plane departed. SSgt Dryer repeated to Captain Cottam that he was serious concerning the appellant's use of drugs, but Captain Cottam, by his testimony, still did not take the remark seriously. He directed that the appellant be told to meet him outside the aircraft.

When the aircraft commander confronted the appellant, he asked a broad question along the lines of, "So, what's going on?" The appellant, appearing very distraught, replied that he was afraid he had ruined his career. He advised Captain Cottam that he had been with a group of persons the evening before and had accepted a small amount of cocaine from one of them. Captain Cottam terminated the conversation and advised the appellant that he would make a report of this matter to appropriate authorities and that he, the appellant, should seek the advice of an attorney at the earliest opportunity. Captain Cottam made an initial report of the situation to the Army commander at Trinidad who directed that the appellant be placed under "house arrest." R.C.M. 304(a)(3).

The appellant sought to suppress his admissions of cocaine use to SSgt Dryer and Captain Cottam because they were not preceded by rights advisements. Article 31, UCMJ, 10 U.S.C. § 831; *United States v. Tempia,* 16 U.S.C.M.A. 629, 37 C.M.R. 249 (1967). One's initial thought is that if ever a situation existed in which persons subject to the Code should not be encumbered with advising a military suspect of his rights prior to questioning him, it is the one that we have just described. However, for reasons we shall set forth, we have concluded that the appellant's incriminatory responses were not admissible and should have been suppressed. Article 31(d), UCMJ; Mil.R.Evid. 304(a), 305(a).

 First, we must determine whether the appellant was suspected of an offense at the times the relevant questions were posed. Clearly enough, SSgt Dryer suspected that the appellant was under the influence of drugs when he questioned him. He testified to this effect on cross-examination, and the nature of the questions he

posed to the appellant suggested his suspicion. Captain Cottam, on the other hand, suspected that the appellant's appearance and demeanor reflected a reaction to alcohol. The nature of Captain Cottam's belief did not make the appellant any less a suspect, at least insofar as the offense of incapacitation for the performance of duties is concerned. This offense may be proved by evidence of previous indulgence in either "intoxicating liquor or any drug." MCM, Part IV, paragraph 76b(3) (1984). In the circumstances of this case, an incriminatory response by the appellant was a reasonable consequence of Captain Cottam's question to him. Mil.R.Evid. 305(b)(2). The fact that the appellant provided incrimination of a somewhat different sort from what the questioner suspected is not a controlling factor.

Of course, case law instructs us that there are exceptions to the requirement for a rights advisement. The requirement "applies only to situations in which, because of military rank, duty, or other similar relationship, there might be subtle pressure on a suspect to respond to an inquiry." *United States v. Duga*, 10 M.J. 206, 210 (C.M.A. 1981) (citing *United States v. Gibson*, 3 U.S.C.M.A. 746, 14 C.M.R. 164 (1954)). *Duga* recites a two-pronged test to assist military judges and appellate courts in determining whether a particular interrogation requires a preliminary rights advisement: "Accordingly, in each case it is necessary to determine whether (1) a questioner subject to the Code was acting in an official capacity in his inquiry or only had a personal motivation; and (2) whether the person questioned perceived that the inquiry involved more than a casual conversation." *Id.* It is clear from their testimony that both SSgt Dryer and Captain Cottam had official concerns about the appellant's condition. They were motivated by something other than idle curiosity in their questioning. The appellant testified that he was nervous and frightened when he was confronted by both superiors. He said he felt compelled to answer their questions, although he feared the consequences of doing so. Nothing in the record rebuts this testimony. Both prongs of the *Duga* standard for determining whether rights advisements were required were satisfied.

Our analysis of the situation at hand serves to emphasize a dilemma military superiors and supervisors may encounter when confronted with unusual or inappropriate behavior by a subordinate. Military law, to date, has not fashioned a satisfactory answer for all occasions. The dilemma was well defined by Judge Cook in *United States v. Lewis*, 12 M.J. 205, 207 (C.M.A.1982), as follows: "However, in carrying out his military duties the superior must be allowed an interplay of communication with subordinates not prefaced in every instance by a warning of rights." Judge Cook then notes the crux of the problem in observing that the superior who obtains an incriminating response may well have precluded its use in a court-martial by the lack of a rights advisement. *Id.* But *cf. United States v. Richards*, 17 M.J. 1016 (N.M.C.M.R.1984), *pet. denied*, 19 M.J. 27 (1984), which suggests that incriminating responses obtained without a rights advisement may be admissible if the questioner is acting in other than a criminal investigative capacity. *See also United States v. Duga*, 10 M.J. at 210, n. 6, citing pre-existing case law to the same effect.

 Appellate government counsel argue that we should apply the public safety exception recognized by the United States Supreme Court in *New York v. Quarles*, 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984). This raises the most noteworthy legal issue in the case. While the public safety exception has not been adopted by the Court of Military Appeals, it was favorably discussed at some length in the recently issued case of *United States v. Jones*, 26 M.J. 353 (C.M.A.1988). However, based on our review of the testimony of the witnesses, we have concluded that the circumstances in this case were not perceived as constituting a situation of sufficient gravity to justify application of the exception. In so doing we have considered the excellent analysis of the *Jones* case when it was before the Army Court of Military Review. Senior Judge Wold, writing for the Court, envisions that the exception would be appli-

cable to those rare military interrogations in which "(a) the possibility exists of saving human life or avoiding serious injury by rescuing the one in danger and (b) the situation is such that no course of action other than questioning a suspect promises relief." *United States v. Jones*, 19 M.J. 961, 967 (A.C.M.R.1985). This appears to be the most definitive statement in military law to date of the nature of circumstances required to justify invoking the public safety exception.

SSgt Dryer was certainly confronted with an unsettling situation when he realized the appellant was hallucinating. He was understandably eager to determine whether, as he suspected, the appellant's behavior resulted from drug use and, if so, what drug or combination of drugs. His concern was generalized. Neither his testimony nor that of other witnesses, when considered in totality, demonstrated an articulable immediate peril to government property or human life. Captain Cottam, by his testimony, was concerned with the impact on crew morale of the appellant's behavior. He expressed no particularized concern with respect to the operational exigencies of the moment. Our reading of *Quarles* and *Jones* persuades us that a perceived danger of some immediacy and magnitude (in other words, an emergency) is required to trigger the public safety exception. The record is simply not sufficiently developed to support a conclusion that emergency circumstances, real or apparent, existed that would justify application of this exception.

In one important respect both *Quarles* and *Jones* represent better fact situations for invoking an overriding public safety concern. In each case, an articulable and immediate danger to human life could be perceived by those conducting the questioning. In *Quarles*, a suspected felon had discarded a firearm, presumed to be loaded, somewhere in a supermarket. In *Jones*, a suspect was asked to provide information on the location of an assault victim who was presumed to have suffered serious injuries. The two cases present circumstances that could correctly be described as having life or death consequences. The record in this case falls short of describing an emergency of similar gravity.

However, the facts before us favor recognition of a public safety exception more than either *Quarles* or *Jones* in another respect. *Quarles* and *Jones* both represented police questioning, in the former case a clearly custodial interrogation. Here, the interrogators were operational personnel. We assume they were not particularly sophisticated in the nuances of Article 31 and the appropriate procedures to be used in questioning a military suspect. It might well be argued that such interrogations are not as likely to result in abuses if reasonable allowances are made for emergency situations. However, if we were to fashion an exception for this situation we would be signalling a rather major shift in the focus of past interpretations of Codal and Constitutional protections. Our understanding of *Duga* and most cases applying its teaching leads to the conclusion that all who occupy a position of superior military authority over a suspect are bound by the requirements of Article 31, notwithstanding the fact that they are more inclined to react instinctively than deliberately when suddenly confronted with the unexpected.

The military judge in this case correctly observed that we are not likely soon to have legally trained advisors aboard C-130s or other Air Force aircraft flying missions in remote areas. We accept that reality and the dilemma it may continue to pose in certain situations. If we were to apply an exception to *Duga* in this case, we would style it as something in the nature of an operational exigency rather than public safety exception. Perhaps the day will come when it appears necessary for the law to move in this direction. It is a larger move than we believe is justified at this time and on the facts before us.

Even if we were to conclude that the public safety exception, or some form of it, were applicable in this case, we would have one additional hurdle to clear on the issue of admissibility. Chief Judge Everett stated in *Jones:* "As we understand *Quarles*, the 'public safety' exception does not make

admissible a statement that was truly involuntary." 26 M.J. at 357. If we accept the appellant's testimony at face value, he felt compelled to respond to SSgt Dryer's and Captain Cottam's inquiries, although he was understandably reluctant to do so. We would have some difficulty in finding that the appellant's admissions were voluntary on this record. As previously stated, we have concluded that the appellant's oral admissions of cocaine use were obtained without rights advisements under circumstances in which rights advisements were required. This evidence should have been excluded.

The day after the incident the appellant was returned by aircraft to Howard Air Force Base, Panama. He was met at the plane by Senior Master Sergeant (SMSgt) McNeill who was the first sergeant of the unit to which the appellant was attached during his temporary duty. SMSgt McNeill told the appellant that he wanted to obtain a urine sample for testing purposes. Prior to meeting the appellant SMSgt McNeill had spoken to the base staff judge advocate and had been advised that sufficient information had been received by radio to support a probable cause urinalysis search. However, the staff judge advocate also advised him that it would be preferable for McNeill to obtain the appellant's consent to provide a sample. Following their meeting the appellant provided a sample of his urine for testing. A defense motion to suppress the urinalysis evidence was unsuccessful.

We now consider the defense contention that the appellant's consent was not freely and voluntarily given. Mil.R.Evid. 314(e)(4). Three witnesses testified during the suppression hearing on this issue. They were the appellant, Chief Master Sergeant (CMSgt) McNeill, who had been promoted to that grade by the time of trial, and Chief Master Sergeant Ringler, the senior enlisted advisor from the appellant's home base who was on temporary duty in Panama and was present when the appellant executed a form signifying his consent to provide urine. The witnesses were in substantial agreement on many aspects of the circumstances leading up to the signing of the form. The appellant was told that he was suspected of wrongful use of controlled substances and fully advised of his rights. There is no dispute that the appellant did in fact sign a form consenting to provide a urine sample and that he subsequently did so.

■ However, one factual issue developed during the course of the hearing was not satisfactorily resolved. All three witnesses recalled that some mention or discussion of a command-directed urinalysis arose in the discussion prior to the appellant's consent to provide a urine sample, although CMSgt McNeill's testimony on this point varied somewhat throughout the hearing. It is difficult for us to determine whether he clearly recalled that this matter was discussed and, if so, whether it was before or after the appellant signed the consent form. Command-directed urinalysis results are not admissible in Air Force courts-martial. See Air Force Regulation 30–2, *Social Actions Program,* paragraph 5–8 (18 April 1986), since revised. The appellant testified that he was under the impression that if he elected not to consent he would be ordered to provide a urine sample. According to the appellant he believed that the base commander from Pope Air Force Base would be notified and would personally direct that he do so. He was aware that the base commander was present at Howard Air Force Base because he had seen him standing nearby when the first sergeant approached him at the aircraft. The appellant testified that he was most anxious to avoid the base commander's direct involvement in the situation. The two government witnesses conceded that there was some mention of a command-direction (in CMSgt McNeill's case, in at least a portion of his testimony). Neither was able to relate the substance of any such discussion, nor could they place it in context with the general discussion of the appellant's rights and options.

■ In *United States v. White,* 27 M.J. 264 (C.M.A.1988), the Court of Military Appeals reviewed a situation that is instructive for our purposes. The accused in that

case was advised upon inquiry that if she did not consent to provide a urine sample her commander would so direct. She was not advised of the consequences of providing a sample of her urine at the commander's direction. Under these circumstances the accused was effectively given no option. The result was "mere acquiescence, not consent." 27 M.J. at 266 (citing *Bumper v. North Carolina*, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968)). *See United States v. Pellman*, 24 M.J. 672 (A.F.C.M.R.1987) (an incomplete discussion of the command-direction option after consent is given by an accused may improperly interfere with his election to withdraw such consent). Mere submission to the color of authority is not voluntary consent. Mil.R. Evid. 314(e)(4). On cross-examination, CMSgt McNeill acknowledged that he might have "mentioned" a command-directed urinalysis to the appellant, but he denied that he attempted to explain the difference between a command-directed urinalysis and a consent urinalysis whether the subject was discussed or not. As was noted in *White:* "Unbeknownst to appellant, the difference between a command-directed urinalysis and a consent urinalysis was the whole ball game." 27 M.J. at 265. Thus, the testimony of the witnesses in this case raised an issue as to whether the appellant voluntarily consented to provide urine or whether his consent was viewed by him as mere acquiescence in the face of a foregone conclusion that his urine would be obtained in any case. This was, at least in part, a factual issue that required resolution by the military judge.

Based on our review of the military judge's findings we do not believe the factual issue as to what was said about command-direction was resolved at trial. The military judge's findings in this regard were very brief. We set them forth in their entirety exactly as they are reported in the record of trial:

> With reference to taking of urine in Panama. The court is satisfied with the procedure used; that there was a rights advisement; that there is a statement signed by the accused; that there was no apparent coercion, certainly there are differences of opinion and there are differences in memory—as the accused said, it had been nearly a year—but the court is convinced overall that the government has met its burden in this matter.

We are reluctant to infer from this cursory treatment of the evidence that the military judge found that the appellant was not advised that he would be given a command-direction to provide urine if he did not consent to do so. We are particularly reluctant to do so in light of the government's burden of establishing voluntary consent by the clear and convincing weight of the evidence, a burden that was not specifically acknowledged by the military judge. Mil.R.Evid. 314(e)(5). We recognize that the military judge was in the best position to evaluate the demeanor of the witnesses and determine their credibility and ability to recall events. However, since he did not articulate specific findings and conclusions on an important factual issue, we must address the matter ourselves. In fairness to the military judge we note that important case law in the area of consent searches has developed since the trial of this case.

Having reviewed the testimony presented we are not persuaded that the appellant's consent to provide urine was uninfluenced by a discussion of a command-direction to provide urine. Accordingly, we are unable to conclude that the appellant voluntarily consented to provide a sample of his urine for testing.

Appellate government counsel maintain that if the appellant's urine was unlawfully obtained the urinalysis evidence was nonetheless properly admitted because it "would have been obtained even if such unlawful search or seizure had not been made." Mil.R.Evid. 311(b)(2). As previously noted, CMSgt McNeill testified that the staff judge advocate had advised him that probable cause existed to direct the appellant to provide urine. The record does not reveal what information concerning the events during and immediately after the flight to Trinidad, Bolivia, had been relayed to Howard Air Force Base. The only indication available to us in the record

is CMSgt McNeill's hearsay testimony as to his understanding that the appellant had previously executed a signed confession. The record does not reflect that the accused had in fact executed a signed confession. Therefore, some question exists as to the accuracy and quality of the information known to the search authority and his staff judge advocate at the time of CMSgt McNeill's meeting with the appellant. We can reasonably infer that some of the information that had been provided to them, and probably a major portion of it, was tainted in any event. Tainted information cannot provide a proper probable cause premise. *See* Mil.R.Evid. 304(a), concerning inadmissibility of evidence derived from an involuntary statement of an accused. The record does not demonstrate a valid probable cause basis for admission of the urinalysis evidence. We do not foreclose the development of this issue if a rehearing is ordered.

We conclude that the military judge erred in denying the motion to suppress the urinalysis evidence. We also conclude that the denial of the two motions to suppress constituted prejudicial error. In so concluding we have carefully considered all evidence of the appellant's guilt that was presented to the trier of fact. In this case the evidence that was properly placed before the military judge during the trial was closely interwoven the appellant's pretrial admissions. Obviously, the urinalysis information was critical to the prosecution case. We are not persuaded that the trier of fact would have found the appellant guilty if the appellant's admissions and the urinalysis data had been suppressed. Under these circumstances, we conclude that the findings of guilty cannot stand.

The findings of guilty and the sentence are set aside. A rehearing may be ordered, or, if a rehearing is deemed to be impractical, the charges and specifications should be dismissed.

Judge BLOMMERS concurs.

Senior Judge KASTL (concurring):

I concur with Senior Judge Lewis' excellent opinion. I write separately to note my reservations with the suggestion in dicta of a possible operational exigency exception to *United States v. Duga,* 10 M.J. 206 (C.M.A. 1981). At this juncture, I tend to believe an operational exigency exception would be a rogue elephant, too capricious for useful legal analysis.