UNITED STATES, Appellant,

v.

John G. LOUKAS, Airman, U.S. Air
Force, Appellee.

No. 62334.
ACM 26543.

U.S. Court of Military Appeals.

Feb. 13, 1990.

For Appellant: *Major Terry M. Petrie*
(argued); *Colonel Joe R. Lamport* and
*Colonel Robert E. Giovagnoni* (on brief).

For Appellee: *Captain Paul M. Danko-
vich* (argued); *Colonel Richard F. O'Hair*
(on brief).

*Opinion of the Court*

SULLIVAN, Judge:

During August 1987, the accused was
tried by a general court-martial composed
of a military judge sitting alone at Pope Air
Force Base, North Carolina. Contrary to
his pleas, he was found guilty of wrongful-
ly using cocaine and being incapacitated for
duty, in violation of Articles 112a and 134,
Uniform Code of Military Justice, 10 USC
§§ 912a and 934, respectively. He was
sentenced to a dishonorable discharge, con-
finement for 8 months, total forfeitures,
and reduction to the lowest enlisted grade.
On December 7, 1987, the convening au-
thority approved the findings and sentence
as adjudged.

On December 16, 1988, a panel of the
Court of Military Review set aside the find-
ings of guilty and the sentence because
evidence was admitted in violation of Arti-
cle 31(d), UCMJ, 10 USC § 831(d). 27 MJ
788. On January 5, 1989, the Government
moved for en banc reconsideration of part
of that decision. This motion was granted

but the en banc court affirmed the previous action of its panel on March 16, 1989. 28 MJ 620.

The Judge Advocate General of the Air Force, pursuant to Article 67(b)(2), UCMJ, 10 USC § 867(b)(2), certified the following question to this Court on April 12, 1989:

WHETHER THE AIR FORCE COURT OF MILITARY REVIEW ERRED AS A MATTER OF LAW IN HOLDING THAT THE *NEW YORK V. QUARLES*, 467 U.S. 649, 104 S.CT. 2626, 81 L.ED.2D 550 (1984), "PUBLIC SAFETY EXCEPTION" DID NOT APPLY TO THE FACTS OF THIS CASE.

We hold that the Court of Military Review need not have made such a legal holding because admission of the challenged testimony was not barred in the first instance by the Fifth Amendment or by Article 31.

In its initial decision, the Court of Military Review panel stated the facts pertinent to admission of Sergeant Dryer's testimony concerning the accused's first pretrial admission of cocaine use, as follows:

[Loukas'] admissions were made during the course of a C–130 aircraft mission in support of drug suppression efforts in South America.

The evidence developed during the suppression hearing was that [Loukas] was on temporary duty from Pope Air Force Base, North Carolina, along with other crew members. [Loukas] was the loadmaster. Following an overnight stay at Panama City, Panama, [Loukas'] crew was scheduled to depart Howard Air Force Base for an early morning flight to Trinidad, Bolivia, where they were to receive a load of unspecified cargo. [Loukas] was not present at the scheduled crew show time. When he finally arrived at the aircraft he was two hours late. The record, surprisingly, does not reflect that he received a particularly unfriendly or otherwise negative greeting from his fellow crew members, all of whom were senior in grade to him. The co-pilot kidded him about the number of ladies he had been with the evening before. SSgt Dryer recalled in his testimo-ny that he teased [Loukas] about his lateness. Apparently none of the crew members, at that point, noted anything in [Loukas'] appearance or demeanor that was alarming.

After the aircraft had been in flight for four or more hours the assistant crew chief, an Airman First Class Taranto, stepped into the cargo section. [Loukas] was the only other person present in that portion of the plane. There was no cargo or equipment on board at that time. *Airman Taranto testified that he observed that [Loukas] was acting in an irrational manner. He pointed in the direction of the flight deck and inquired of Airman Taranto, "Do you see them?" and, "Do you see her?" Airman Taranto did not see anyone. It was apparent to him that [Loukas] was experiencing a hallucination. [Loukas] handed Airman Taranto his survival vest and .38 calibre pistol and told him to take it (apparently referring to the firearm) and that he didn't want it.* The witness reported the incident to his immediate superior, SSgt Dryer, the crew chief.

SSgt Dryer went to the back of the aircraft and confronted [Loukas]. He testified during the hearing on the motion to suppress that he noted he *[Loukas] appeared to be nervous and that he was perspiring profusely even though it was cool in that portion of the plane. [Loukas] continued to hallucinate. Gesturing in the direction of the flight deck, he inquired why "those people" were there and wondered why "they" didn't just come down and get him.* The witness stated that he asked *[Loukas] if he had taken any drugs.* [Loukas] responded that he had not. SSgt Dryer leaned over close to where [Loukas] was sitting so that he could observe his eyes and asked in a more insistent manner, *"Come on, what have you taken?"* or, *"What are you on?"* or words to that effect. [Loukas] replied *that he had taken some cocaine the night before.* SSgt Dryer asked, "Is

*that all?" He received an affirmative answer.* SSgt Dryer advised [Loukas] to secure his seatbelt and relax. According to his testimony he was somewhat concerned for the safety of the aircraft and its flight crew, particularly if [Loukas] started "freaking out."

SSgt Dryer reported his observations of [Loukas] to the flight engineer, a Technical Sergeant Drummond. The latter went to the back of the aircraft and observed [Loukas]. He retrieved bullets that [Loukas] had on his person. He returned to the flight deck area and consulted with SSgt Dryer. They concluded that the situation was under control and that it would not be necessary to alert the aircraft commander, Captain Cottam. It was agreed that someone would maintain direct observation of [Loukas] during the remainder of the flight.

27 MJ at 790–91 (emphasis added).

----

█ The stated premise of the Court of Military Review majority opinions, both panel and en banc, (6–3), was that Sergeant Dryer was obligated by Article 31(b) to warn the accused of his rights before questioning him about possible drug use. This legal conclusion was drawn on the basis of the decision of this Court in *United States v. Duga,* 10 MJ 206 (CMA 1981), and a finding of fact that Sergeant Dryer was acting officially and not simply out of "idle curiosity." 27 MJ at 792. We disagree as a matter of law because the crew chief's inquiry was not a *law-enforcement or disciplinary* investigation which is also required before Article 31(b) becomes applicable. *United States v. Gibson,* 3 USCMA 746, 752, 14 CMR 164, 170 (1954); *see United States v. Duga, supra* at 211.

In reaching this conclusion we first note the statutory language of Article 31, which states:

(a) No person subject to this chapter may compel any person to incriminate himself or to answer any question the answer to which may tend to incriminate him.

(b) No person subject to this chapter *may interrogate, or request any statement from an accused or a person suspected of an offense* without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial.

(c) No person subject to this chapter may compel any person to make a statement or produce evidence before any military tribunal if the statement or evidence is not material to the issue and may tend to degrade him.

(d) No statement obtained from any person in violation of this article, or through the use of coercion, unlawful influence, or unlawful inducement may be received in evidence against him in a trial by court-martial.

(Emphasis added.)

This Court has long intimated that this statute requires warnings only when questioning is done during an official law-enforcement investigation or disciplinary inquiry. *See generally Article 31(b): Who Should Be Required To Give Warnings?,* 123 Mil. L. Rev. 151, 199 n.181 (1989); J. Munster and M. Larkin, *Military Evidence* § 7.2*b* at 153 n.86 (2d ed.1978). Chief Judge Quinn has articulated the following rationale for our construction of this important codal provision:

Article 31(b), *supra,* extends the provisions of its predecessor, Article of War 24, ... to persons "suspected" as well as "accused," but no intention to extend the requirement to other than "official investigation" is found in the legislative history of the Uniform Code.

\* \* \* \* \* \*

Taken literally, this Article is applicable to interrogation by all persons included within the term "persons subject to the code" as defined by Article 2 of the Code, *supra,* 50 USC § 552, or any other who is suspected or accused of an offense. However, this phrase was used in

a limited sense. *In our opinion, in addition to the limitation referred to in the legislative history of the requirement, there is a definitely restrictive element of officiality in the choice of the language "interrogate or request any statement," wholly absent from the relatively loose phrase "person subject to this code," for military persons not assigned to investigate offenses, do not ordinarily interrogate nor do they request statements from others accused or suspected of crime. See United States v. Wilson and Harvey,* 2 USCMA 248, 8 CMR 48. This is not the sole limitation upon the Article's applicability, however. Judicial discretion indicates a necessity for denying its application to a situation not considered by its framers, and wholly unrelated to the reasons for its creation.

*United States v. Gibson, supra* at 752, 14 CMR at 170 (emphasis added).

Judge Latimer opined similarly in his opinion concurring in the result in the same case:

I would affirm the conviction on the basis of the test laid down by me in my dissent in *United States v. Wilson and Harvey, supra.* In that case I stated: "... Accordingly, I believe before the advice required by the Article need be given, three conditions should be fulfilled: *first, the party asking the question should occupy some official position in connection with law enforcement or crime detection;* second, that the inquiry be in furtherance of some official investigation; and third, the facts be developed far enough that the party conducting the investigation has reasonable grounds to suspect the person interrogated has committed an offense."

Collectively, all three conditions suggest that the interrogation be surrounded with an air of some officiality and I believe the Manual for Courts–Martial, United States, 1951, ..., and the hearings before the Committees of Congress support that proposition (see Comments, pages 990–991, Hearings Before the House Committee on Armed Services, 81st Congress, 1st Session, on H.R. 2498, Uniform Code of Military Justice). Moreover, a reading of the Article is convincing that Congress could not have intended Article 31(b) to cover casual conversations, because the language used compels the conclusion that the interrogator is pursuing some official inquiry as he must know that the person to whom he is talking is suspected of a crime; he must inform him of the nature of the accusation; and he must explain to him that what he says may be used against him in a court-martial.

3 USCMA at 763, 14 CMR at 181 (emphasis added).

Finally, Chief Judge Everett, speaking for the Court in *United States v. Duga,* 10 MJ at 211, more recently suggested the same criteria when he stated:

In the case at hand, the evidence only permits the conclusion reached by the Air Force Court of Military Review that the questioning of appellant by Byers did not fall within the purview of Article 31(b). The two prerequisites which determine whether Article 31(b) warnings were required are not met in this case. As found by the Court of Military Review, the record reveals that the questioning was not done in an official capacity—*that is, Byers was not acting on behalf of the Air Force—either as a security policeman or as an agent of the OSI.* Since the appellant declined to present any evidence on the issue, *cf. United States v. Beck,* [15 USCMA 333,] at 339, 35 CMR at [305,] 311, Byers' testimony is completely uncontroverted as to their camaraderie and affiliation in the same security police squadron, and his statement that when the appellant rode up to the gate on his bike, he was only "speaking [to him] more or less like a friend to a friend," or, as elsewhere described by him—it was "more or less like-buddy-to-buddy talk you might say." No evidence contradicts the inference that the questioning by Byers was solely motivated by his own personal curiosity

and was entirely unconnected with his previous contact with the OSI. *In any case, in what the OSI told Byers, it neither directed nor advised him to question the appellant.* In view of the uncontradicted nature of the testimony, we have no choice but to uphold the lower court's finding of a lack of the officiality which is essential to requiring the Article 31(b) warning.

(Emphasis added.) Accordingly, we conclude that the Court of Military Review in both its panel and its en banc decisions too broadly construed and applied this codal provision. 10 MJ at 210 n.6, citing *United States v. Dohle*, 1 MJ 223 (CMA 1975).

An example of official, but not law-enforcement or disciplinary, questioning which is permitted without warnings under Article 31 is found in *United States v. Fisher*, 21 USCMA 223, 44 CMR 277 (1972). This decision was cited by Chief Judge Hodgson and Judge Holte, as well as Judge Murdock, in their dissenting opinions in the court below. 28 MJ at 623, 625. In that case, we held that a military doctor, not performing an investigative or disciplinary function or engaged in perfecting a criminal case, was not required to preface his medical diagnostic questions to a military subordinate with Article 31 warnings. *See United States v. Malumphy*, 13 USCMA 60, 61–62, 32 CMR 60, 61–62 (1962); *United States v. Malumphy*, 12 USCMA 639, 640, 31 CMR 225, 226 (1962); *United States v. Baker*, 11 USCMA 313, 29 CMR 129 (1960).

In the case before us, Sergeant Dryer was the crew chief of an operational military aircraft who was similarly responsible for the plane's safety and that of its crew, including the accused, his military subordinate. In addition, his questioning of the accused was limited to that required to fulfill his operational responsibilities, and

there was no evidence suggesting his inquiries were designed to evade constitutional or codal rights. *United States v. Cross*, 14 USCMA 660, 662–63, 34 CMR 440, 442–43 (1964). *See United States v. Malumphy*, 13 USCMA at 62, 32 CMR at 62. *Cf. United States v. Lee*, 25 MJ 457 (CMA 1988). Finally, the unquestionable urgency of the threat and the immediacy of the crew chief's response underscore the legitimate operational nature of his queries.\* *See United States v. Hessler*, 7 MJ 9 (CMA 1979). *See also United States v. Henry*, 21 USCMA 98, 44 CMR 152 (1971). Under our precedents, the prosecution satisfactorily showed that Article 31 warnings were not required in this operational context. *United States v. Beck*, 15 USCMA 333, 35 CMR 305 (1965); *see* Mil. R. Evid. 304(e), Manual for Courts–Martial, United States, 1984. *See generally United States v. Battles*, 25 MJ 58, 60 (CMA 1987).

As far as the so-called "public safety exception" referenced in the certified issue is concerned, we note that, strictly speaking, this is an exception to the *Miranda* warning requirements established by the Supreme Court to preserve Fifth–Amendment rights. *New York v. Quarles*, 467 U.S. 649, 655–56, 104 S.Ct. 2626, 2631–32, 81 L.Ed.2d 550 (1984). These warnings apply to a suspect in custody and his interrogation by law-enforcement officials. There is no contention in this case that the accused was a suspect in custody or that Sergeant Dryer was a law-enforcement official, so *New York v. Quarles, supra*, is not readily applicable. *Cf. United States v. Morris*, 28 MJ 8, 13 (CMA 1989); *United States v. Jones*, 26 MJ 353, 355 (CMA 1988). Whether a similar exception to Article 31 exists for military superiors acting in a command disciplinary function when questioning a suspect who is not in custody is an issue beyond the facts of this case.

---

\* This Court has implicitly held that a superior in the immediate chain of command of the suspect subordinate will normally be presumed to be acting in a command disciplinary function. *United States v. Seay*, 1 MJ 201 (CMA 1975). *See United States v. Doyle*, 9 USCMA 302, 310, 26 CMR 82, 90 (1958); *cf. United States v. Hop-* kins, 7 USCMA 519, 521–22, 22 CMR 309, 311–12 (1957). However, this presumption is not so broad or inflexible as to preclude a limited exception where clearly justified. *See United States v. Beck*, 15 USCMA 333, 338–39, 35 CMR 305, 310–11 (1965).

*See generally United States v. Beck, supra* at 339, 35 CMR at 311; *see United States v. Ricks*, 2 MJ 99, 101 (CMA 1977); *United States v. Vail*, 11 USCMA 134, 28 CMR 358 (1960).

 Finally, we agree with the court below that Captain Cottam's subsequent questioning of the accused without warnings violated Article 31(b) of the Code. *See United States v. Loukas*, 27 MJ at 791–92. However, his testimony was cumulative of Sergeant Dryer's testimony and, accordingly, we hold that its admission under the circumstances of this case was harmless error. Art. 59(a), UCMJ, 10 USC § 859(a). To the extent that *United States v. Reynolds*, 16 USCMA 403, 406, 37 CMR 23, 26 (1966), might be cited as precluding such an examination for prejudice, we hold that its authority has by now dissipated. *See generally Milton v. Wainwright*, 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972). *See United States v. Quillen*, 27 MJ 312, 315 (CMA 1988); *United States v. Hallock*, 27 MJ 146, 148–49 (CMA 1988); *United States v. Applewhite*, 23 MJ 196, 199–200 (CMA 1987); *United States v. Remai*, 19 MJ 229, 233 (CMA 1985).

The decision of the United States Air Force Court of Military Review setting aside the findings of guilty and the sentence is reversed. The record of trial is returned to the Judge Advocate General of the Air Force for resubmission to that court for further review under Article 66, UCMJ, 10 USC § 866.

COX, Judge (concurring):

Like Judge Sullivan—with whose opinion I concur entirely—I start with the *language* of Article 31(b), Uniform Code of Military Justice, 10 USC § 831(b):

No person subject to this chapter may *interrogate, or request any statement* from an accused or a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement....

(Emphasis added.) I presume Congress meant something when it chose this language.

In particular, the statute does not say: No person who, "because of military rank, duty, or other similar relationship," might apply "subtle pressure on a suspect to respond" shall talk to a suspect without first informing him of his rights, etc. *See United States v. Duga*, 10 MJ 206, 210 (CMA 1981).

"Person" refers to any person who "interrogates," etc. Thus, contrary to the assertion of the dissent (based upon the gloss of case law and the "purpose of Article 31(b)"), the focus of the statute is *precisely* on the nature and purpose of the questioning, not the happenstance position of the questioner.

Also, like Judge Sullivan, I look to the circumstances of the case to determine if what occurred was an interrogation or a request for a statement. While I must concede that reasonable people may sometimes disagree as to the meaning of those terms, I would infer from the placement of the language in a military justice code that the interrogation or request for a statement would in some way be connected with a criminal-justice or disciplinary purpose. Therefore, a most pertinent area for inquiry would be the motivation of the person asking the questions.

Without attempting to apply these principles to all cases that may come before us, I totally agree with Judge Sullivan that, when military aircraft personnel discover an armed servicemember hallucinating in the belly of an aircraft in flight, and they ask him whether he has taken some drugs, it is obvious that the *last* thing in their minds is the possibility of a criminal prosecution somewhere down the line. Thus, I detect no inference of an interrogation or a request for a statement within the meaning of Article 31(b) from these circumstances.

Even though the accused had been relieved of his pistol at the time of his questioning, it was not until *after* the questioning that the aircraft personnel could decide if there was an imminent threat of serious

aberrational behavior or the need for an immediate landing—for either the safety of the aircraft or the medical needs of the accused.

In my view, the noninterrogational purposes of these immediate actions are so clear that, as a matter of law, we can reverse the Court of Military Review. Accordingly, I concur with the principal opinion.

EVERETT, Chief Judge (dissenting):

I dissent from the majority opinion because, in my view, it violates three important principles. The first is that this Court should not rewrite well-established caselaw without careful consideration and ample justification. Second, as an appellate court we must take the testimony as it exists in the record, even though we cannot imagine why the witnesses testified as they did. *Cf. United States v. Harris*, 29 MJ 169 (CMA 1989). Finally, our Court may not interfere with the exercise of the factfinding powers granted to the Courts of Military Review by Congress in Article 66(c), Uniform Code of Military Justice, 10 USC § 866(c).

I

A

Article 31(b) of the Uniform Code, 10 USC 831(b), provides that

[n]o person subject to this chapter may interrogate, or request any statement from an accused or a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make by any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial.

Some of this language has been given a broad interpretation. For example, " '[i]nterrogation' includes any formal or informal questioning in which an incriminating response either is sought or is a reasonable consequence of such questioning."

Mil.R.Evid. 305(b)(2), Manual for Courts-Martial, United States, 1984; *see also United States v. Seay*, 1 MJ 201 (CMA 1975). The term "statement" includes such testimonial conduct as identifying the clothing items which belong to the suspect. *See United States v. Williams*, 10 USCMA 578, 28 CMR 144 (1959); *United States v. Bennett*, 7 USCMA 97, 21 CMR 223 (1956); *United States v. Holmes*, 6 USCMA 151, 19 CMR 277 (1955); *United States v. Taylor*, 5 USCMA 178, 17 CMR 178 (1954). Any "language, or its equivalent" may be a "statement" for purposes of Article 31(b). *See United States v. Bennett, supra* at 100, 21 CMR at 226. Furthermore, a warning must precede *"any* statement 'regarding the offense of which [the servicemember] is accused or suspected' quite apart from whether he feels that his truthful reply would serve to incriminate him." *United States v. Taylor, supra* at 181, 17 CMR at 181.

In one respect, however, Article 31(b) has been construed more narrowly than its language might suggest. In *United v. Gibson*, 3 USCMA 746, 14 CMR 164 (1954), this Court considered admissibility of certain answers given by the accused to questions asked him by a fellow prisoner, Private First Class Ferguson. When Gibson had been placed in pretrial confinement, the Criminal Investigation Division (CID) had asked the provost sergeant "to assign another prisoner to watch the accused ... and recommended that 'a good reliable rat' be selected for the purpose." Subsequently, Gibson made "incriminating statements" to Ferguson "in the course of what on its face was an ordinary conversation between inmates of a stockade." 3 USCMA at 750, 14 CMR at 168. Chief Judge Quinn concluded that the purposes of Article 31(b) required an "element of officiality" in the interrogation or request for a statement in order to trigger the warning requirement. *Id.* at 752, 14 CMR at 170. Judge Brosman, concurring, observed:

Each of my brothers has construed Article 31(b) to apply only if an element of officiality attaches to the interrogation of

a person accused or suspected of a crime. In doing this, each—because of the purpose revealed in the legislative background of Article 31(b)—has chosen to read into that enactment something not clearly visible in its verbiage. Nowhere do I find an express statement in the Uniform Code that Article 31(b) deals only with persons subject to the Code who are engaged in an *official* investigation. Yet I have no sort of quarrel with the practice of examining legislative history to ascertain the purpose of Congress in enacting a statute. Nor is such a procedure alien to recognized canons of statutory construction.

*Id.* at 753, 14 CMR at 171 (footnote omitted).

Judge Latimer, concurring in the result, accused his fellow judges of "concur[ring] in a principle which results in a classic example of judicial legislation." *Id.* at 757, 14 CMR at 175. In his view PFC Ferguson, the undercover agent, was free to "listen, observe, and report," *id.* at 758, 14 CMR at 176, but was subject to the warning provision if he sought to obtain a confession or admission by questioning the accused.

In *United States v. Souder*, 11 USCMA 59, 28 CMR 283 (1959), two accordions had been stolen from a person in the naval service, who duly reported his loss to naval security personnel. They, in turn, advised local music stores to be on the lookout for the instruments. Souder and a fellow sailor entered a music store in the area which was owned and operated by Lieutenant (jg) Gallagher. They had possession of one of the stolen accordions. Gallagher, a naval officer on active duty, observed that the accordion fit the description he had received from naval security personnel of one of the stolen instruments. During a conversation with the two sailors, Gallagher obtained incriminating admissions from them.

Judge Ferguson's opinion for the Court concluded that Lieutenant Gallagher had been under a duty to advise both sailors of their rights under Article 31(b) before questioning them about the stolen musical instruments, since he was a person subject to the Code and suspected them of a crime. Chief Judge Quinn, concurring, stated:

> The mere fact that Lieutenant Gallagher is a person subject to the Uniform Code of Military Justice is not, as the principal opinion implies, the whole of the matter in determining whether there has been a violation of Article 31. There are some situations to which Article 31 does not apply, even though the participants are persons subject to the Uniform Code. *United States v. Gibson*, 3 USCMA 746, 14 CMR 164; *United States v. Dandaneau*, 5 USCMA 462, 18 CMR 86.

11 USCMA at 61, 28 CMR at 285.

Judge Latimer, concurring in the result, concluded that Lieutenant Gallagher should have given a warning because an official criminal investigation had begun, and he was aiding military authorities in that investigation.

In *United States v. Beck*, 15 USCMA 333, 35 CMR 305 (1965), the Court considered a statement made by the accused to a military policeman, Grimsley, a personal friend who had no investigative duties. Grimsley had picked Beck up at a local civilian jail and, accompanied by another guard, had started to drive him back to their place of duty. On the way the accused started a "conversation ... between two friends." *Id.* at 336, 35 CMR at 308.

Judge Ferguson, writing for a unanimous Court, pointed out:

> This Court has long held that the preliminary warning under Code, *supra*, Article 31, is not necessary when it appears that the accused's statement was either spontaneously made or was not "officially" obtained. Whether a warning under the Article is required, however, because of the "officiality" of the inquiry necessarily depends upon the facts of each case.

15 USCMA at 337, 35 CMR at 309 (citations omitted).

Thereafter, Judge Ferguson reviewed the cases and concluded:

From the foregoing, certain, if not always well-defined, principles regarding the need for the preliminary warning emerge. It is certain, for example, that a military investigator, or one acting as such, who suspects an accused of an offense and questions him in connection with such allegations, is expressly required to advise him of his rights. At the other end of the spectrum, it is equally clear that inquiries made by a close friend on a personal basis and without regard to any military relationship between him and the accused is not within the ambit of Article 31. Lying between these two poles are situations involving purported action only on behalf of the civil authorities, participation in interviews by persons not subject to the Code on a claimed private basis, perfunctory inquiries in the ordinary discharge of a nonmilitary type of responsibility, and the lack of any police responsibility on the part of the interrogator. The ultimate inquiry in every case is whether the individual, in line of duty, is acting on behalf of the service or is motivated solely by personal considerations when he seeks to question one whom he suspects of an offense. If the former is true, then the interrogation is clearly official and a preliminary warning is necessitated. If the latter situation is presented, then the warning is not required as a predicate for receipt of accused's responses....

*Id.* at 338, 35 CMR at 310 (citations omitted).

In other words, the Court in *Beck* recognized a continuum: At one extreme—where warnings clearly are required—is a situation in which a law-enforcement agent questions the accused as a suspect; at the other extreme—where warnings clearly are not required—is a situation in which a close friend is engaged in a personal conversation with the accused as a friend, without regard to any military relationship between the two of them. In the middle are all the other myriad situations in which, until now, the question to be answered has been, simply: Was a questioner acting in line of duty in an official capacity on behalf of the Service?

In accord with this analysis, the Court concluded in *Beck* that it could "not hold, as a matter of law, that the law officer should have excluded the accused's conversations with Grimsley while he was in the latter's custody." On the other hand, the evidence also left "open" the possibility that "Grimsley, in talking with the accused, was acting 'officially' and thus was under a duty to advise him of his rights under Code, *supra*, Article 31." *Id.* at 339, 35 CMR at 311.

In *United States v. Seay*, 1 MJ 201 (CMA 1975), the Court ruled on a statement made by the accused during an "informal" session with his troop commander, who was counseling him with regard to his obligations "to take care of his bad checks." 1 MJ at 202. Chief Judge Fletcher's lead opinion concluded that, "[i]rrespective of whether an Article 31 warning may have alarmed the appellant or obfuscated the purpose of the interview, a warning was still required since the commander acting in his official capacity sought to question the appellant whom he suspected of a criminal offense." 1 MJ at 203 (footnote omitted). Judge Cook, concurring in the result, did not agree that an Article 31(b) warning was required but concluded that there had been an implied promise of confidentiality which rendered the statement inadmissible.

Senior Judge Ferguson, also concurring in the result, would have "appl[ied] the literal language of Article 31," 1 MJ at 205, and would have "remov[ed] from consideration such irrelevant factors as whether the questioner did or did not ask his questions in an official capacity." 1 MJ at 206. In his view,

the reason for th[e] broad liberal proscription imposed by Congress is illustrated by the case at bar. In the military, unlike civilian society, the exact relationship at any given moment between the ordinary soldier and other service personnel in authority (i.e., commissioned

and noncommissioned officers) often is unclear. In the civilian experience, it is unlikely that anyone to whom *Miranda* [*v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966),] might apply would question someone else other than in the former's official capacity—that is, as a law enforcement officer. However, in the military a company commander may advise or question a member of his command for any of a number of different legitimate reasons, only one of which might relate to a criminal offense. Thus, to simplify matters, and in recognition of the superior/subordinate atmosphere inherent in the military [but] not present in the civilian structure, the requirement is broader in the former than in the latter.

1 MJ at 206 (footnote omitted).

Finally, in *United States v. Duga*, 10 MJ 206 (CMA 1981), this Court, almost a decade ago, provided additional guidance as to the purposes and scope of Article 31(b). Quoting at some length from *United States v. Gibson*, 3 USCMA at 752, 14 CMR at 170, we affirmed:

"Careful consideration of the history of the requirement of warning compels a conclusion that its purpose is to avoid impairment of the constitutional guarantee against compulsory self incrimination. *Because of the effect of superior rank or official position upon one subject to military law*, the mere asking of a question under some circumstances is the equivalent of a command. A person subjected to these pressures may rightly be regarded as deprived of his freedom to answer or to remain silent...."

10 MJ at 209 (emphasis added). Accordingly, we held:

Therefore, in light of Article 31(b)'s purpose and its legislative history, the Article applies only to *situations in which, because of military rank, duty, or other similar relationship*, there might be subtle pressure on a suspect to respond to an inquiry. *United States v. Gibson, supra.* Accordingly, in each case it is necessary to determine whether (1) a questioner subject to the Code was *acting in an official capacity in his inquiry or only had a personal motivation;* and (2) whether the person questioned perceived that the inquiry involved more than a casual conversation. *United States v. Gibson, supra.*

10 MJ at 210 (emphasis added).

Because Duga's statement to a security policeman had occurred during a perceived casual conversation, we concluded that it was admissible. However, the test employed in *Duga* and in its predecessors has been whether the person asking the question or requesting a statement was acting in an official capacity—acting for the benefit of the armed services—or was only acting in a personal capacity.[1] This standard is much broader than that which the present majority now seeks to substitute, whereunder a warning is required *"only when questioning is done during an official law-enforcement investigation or disciplinary inquiry "*—whatever that phrase means. 29 MJ 385, 387 (Sullivan, J.) (emphasis added).

This test, which departs still further from the language of Article 31(b), has not been used heretofore in any majority opinion of this Court, so far as I am aware. It fails to recognize that, under our precedents, someone who has "disciplinary authority" over an accused or suspect, or who performs a "disciplinary function" with respect to that person, is required by Article 31(b) to give a warning even though he may not be involved in a "law-enforcement investigation or disciplinary inquiry." Most importantly, it does not fully carry out the purpose of Article 31(b) as recognized in our earlier opinions—namely, to protect an accused against subtle pressures

---

1. In *United States v. Gibson, supra,* the majority concluded that an Article 31(b) warning was not required because the suspect would not have *perceived* that the questioning had any official aspect. This rationale is at odds with the result in *United States v. Souder,* 11 USCMA 59, 28 CMR 283 (1959), as the suspect there was unaware that the music store operator was a naval officer. *See United States v. Duga,* 10 MJ 206, 211 n. 7 (CMA 1981).

to answer resulting from the superior rank or official position of the questioner.

Professors Munster and Larkin, in their *Military Evidence* § 7.2*b* (2d ed.1978)—cited today by the majority for its proposed narrow standard—wrote:

> On the other hand, even though a person subject to the Code may conduct an interrogation of or request a statement from a suspect, he does not come within the operation of Article 31(b) *unless he is doing so officially and not in a purely private capacity.*

*Id.* at 152 (emphasis added; footnote omitted). In an excellent footnote in this section, the authors set out at length and discuss contrasting situations in which this Court has held that Article 31(b) warnings were or were not required. Many in the former category involved situations where commanders or others with disciplinary authority over the accused had asked the questions at issue. *Id.* at 153 n. 86. The pivotal distinguishing fact in those cases has *not* been whether the questioner was conducting an "official law-enforcement investigation or disciplinary inquiry."

In enacting Article 31(b), Congress was sensitive to the fact that, in the military, some questions by some people under some circumstances are not so much requests, to be answered in the discretion of the person questioned, but *commands* to be answered without hesitation. Consistent with that sensitivity, this Court should not whittle away any further at the scope of Congress' Article 31(b) warning requirement.

**B**

Even if there were merit in the majority's new, more restrictive standard, this is not the case in which it should be announced or applied. The military judge did not rely on this more restrictive standard in denying the motion to suppress. Neither

in the original decision nor in the decision en banc on reconsideration did *any* of the nine judges of the Court of Military Review adopt such a standard. The certified question, through which the case reached our Court, concerns the "public safety exception" and does not seek the redefining of the basic standard to be used in determining when Article 31(b) applies. Moreover, the case has not been briefed or orally argued in a way that would produce an informed consideration by this Court of the need to abandon its long line of precedent.

Finally, even under the restrictive standard espoused by the majority, one of the statements by Loukas—his statement to Captain Cottam, the aircraft commander—could not properly be admitted in evidence. That statement—which the principal opinion recognizes as inadmissible—was made after the plane had landed and had resulted in the accused's "house arrest"; clearly it was obtained incident to an official "disciplinary inquiry." Without any argument on the point, I hesitate to brush aside this inadmissible statement as merely "cumulative" evidence.[2]

**II**

The military judge took the position that an Article 31(b) warning to Loukas was not required because of the "public safety exception." I have no doubt that—just as the requirement of a *Miranda* warning is subject to a "public safety exception," *see New York v. Quarles*, 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984)—the warning requirement of Article 31(b) also is subject to a "public safety exception." *Cf. United States v. Jones*, 26 MJ 353, 356–57 (CMA 1988); *see United States v. Morris*, 28 MJ 8 (CMA 1989). Likewise, I am sure that, under some circumstances, a question asked one member of an aircraft crew by

---

**2.** Loukas pleaded not guilty and offered extensive evidence that he was innocent because of the circumstances under which he had ingested cocaine. Since the majority concedes that the statement to Captain Cottam was inadmissible, it would be necessary to establish that this statement did not prejudice Loukas with respect to

his defense. Indeed, one of our precedents suggests that reception in evidence of a statement obtained in violation of Article 31 is prejudicial "without regard to the state of the record otherwise." *See United States v. Reynolds*, 16 USCMA 403, 406, 37 CMR 23, 26 (1966).

another member might fall within the "public safety exception." I conclude, however, that this exception should not be applied by our Court in this case.

Some of the government evidence indicates that it was important for the safety of the aircraft that information be obtained from Loukas about the drug he had used. On the other hand, as Judge Kastl points out in his concurring opinion, 28 MJ 620, 623, this testimony from Sergeant Dryer indicates that he did not believe the safety of the plane was at risk when he questioned Loukas:

Q. Were you afraid when you went to talk to [the accused] to ask these questions—that he was going to grab a chain or any other article in that aircraft?

A. No, sir.

\* \* \* \* \* \*

Q. Were you afraid at any time that he was going to attack or grab any article on the aircraft?

A. No, sir.

Q. Was the flight of that aircraft or the airplane itself at any time during this flight in danger because of the accused?

A. No, sir.

Our Court may not disregard this testimony, even though we may be of the opinion that any reasonable person on that aircraft should have felt mortal fear at the time Loukas was being asked, "Come on, what have you taken?" or "What are you on?" or words to that effect.

The military judge, an experienced Air Force officer, decided from the testimony he had heard that it was necessary for the plane's safety that Sergeant Dryer determine forthwith what drug Loukas had used. In my opinion there was ample evidence to support the judge's ruling that the accused's statement to Sergeant Dryer fell within the "public safety exception."[3]

However, we must remember that, even though the military judge was authorized to find the facts relevant to admissibility of the accused's statements, his power is not final. Instead, the military judge's factual determinations—like his legal conclusions—are subject to review by the Court of Military Review, which also has factfinding powers. Art. 66(c), UCMJ, 10 USC § 866(c). Undoubtedly, the legislative intent was that the judges of the Court of Military Review would be experienced officers who would carefully review records of trial with detachment, free of command influence, and with an opportunity for reflection that does not exist at the trial level.

In this case, the Court of Military Review judges exercised their factfinding power. Six of the nine appellate military judges on that court decided that no threat to the safety of the aircraft was perceived at the time when Loukas was questioned. The aggregate military experience of these six Air Force officers is substantial; and that experience provided them an excellent basis for making a factual determination as to whether the safety of the aircraft had been endangered.

Of course, there was *no* evidence which justified applying the "public safety exception" to the accused's statement to Captain Cottam, the aircraft commander, after the plane had landed. When Loukas made that statement, he presented no danger to the plane, which had landed; and there was no emergency need-to-know whether he had taken a drug.

Like the military judge and the three dissenters below, I might have evaluated the evidence differently from the majority on the Court of Military Review. However, they acted conscientiously and, so far as I can determine, without being under any misapprehension of law. Under these circumstances, our Court has no authority

---

3. At one point the military judge stated that "Article 31 rights are to be given before custodial interrogation." Contrary to the implication of this comment, the requirement that an Article 31(b) warning be given exists even when a suspect is not in custody. Apparently, however, this was only a momentary lapse on the judge's part, which we may disregard.

to interfere with the exercise of its fact-finding powers by the Court of Military Review. Indeed, to do so contravenes Article 66.

## III

Therefore, I must vote to uphold the decision of the Court of Military Review, so I would answer the certified question in the negative.