624 P.2d 882

The STATE of Arizona, Appellee,

v.

Patrick Gerald HENRY, Appellant.

2 CA–CR 1934.

Court of Appeals of Arizona,
Division 2.

Dec. 31, 1980.

Rehearing Denied Feb. 4, 1981.

Review Denied March 3, 1981.

Stephen D. Neely, Pima County Atty. by D. Jesse Smith and W. Randolph Stevens, Jr., Deputy County Atty., Tucson, for appellee.

Ronald W. Sommer, Tucson, for appellant.

## OPINION

HOWARD, Judge.

Appellant, convicted by a jury of attempted murder, second degree, was sentenced to not less than five nor more than fifteen years in the Arizona State Prison. Appellant contends his conviction should be reversed because (1) it was obtained by the use of illegally seized evidence; (2) his arrest in Arizona was the result of a subterfuge to defeat his resistance to extradition; (3) evidence that the intended victim had been hypnotized before trial to refresh her memory was improperly admitted and (4) the trial court erred in instructing the jury on the crime of attempted murder. We affirm.

Appellant was married to Christina Bellios in May of 1971, immediately after his graduation from medical school. His bizarre and threatening conduct towards his wife during their marriage eventually led to her return to her parents in Tucson and a divorce. She was awarded custody of their only child. The following account of the crime is based upon Dr. Henry's testimony at trial.

After the divorce, Dr. Henry began to formulate a plan to kidnap his child, which scheme was subsequently modified to include the murder of his ex-wife. Using the name of Terry Cordell, a mental patient at the Maryland hospital where the doctor was doing his residency, he created a false identity by securing a birth certificate, social security card, and driver's license in Cordell's name. He also accumulated material to be used for his "Terry Cordell disguise".

The opportunity to murder his wife finally arrived when he was invited to a dermatology convention in Dallas, Texas as it provided him with a perfect alibi. In Maryland, he reserved a private room in Dallas so that he could come and go undetected. He also reserved a flight on Continental Airlines from Dallas to Tucson in the name of Terry Cordell with a return flight to Dallas on American Airlines in the name of a friend, Donald Vester. He planned to change from the Terry Cordell disguise to the Donald Vester outfit prior to his departure from Tucson.

Before he left Maryland, Dr. Henry placed the intended murder weapon, a .32 caliber revolver, in a black attache case which had a broken handle, along with other items which might be used to perpetrate the crime.

After he checked into his motel room in Dallas, he wrote down his plan, step by step, together with a last minute check list and placed both in his wallet. When he left the motel room, he was dressed in his clumsy Cordell disguise.

Dr. Henry checked the attache case as baggage and because he could not find it when he arrived in Tucson, he filed a lost baggage claim with Continental Airlines. While he could not immediately carry out his plan to murder his wife, the plan was still in effect. In the early morning hours, he walked ten miles to her house, watched it and jotted down the activities in the area. Shortly after 7:15 a. m., Christina and their son left the house while he was in plain view about 100 feet away. He walked away to get out of sight.

Christina operated a nursery school in the house next door to her own. Dr. Henry became curious when he did not see any activity at the school so he called Christina, pretending to be Tim LaShanta, a person who was interested in seeing the school. After the conversation, he was struck with remorse and realized he could never kill Christina. He then walked downtown to the Marriott Hotel and took an airport limousine to the terminal. He went to the Continental Airlines ticket counter and upon inquiry, was handed his lost attache case.

While we have set forth the foregoing facts as recited by the doctor, there was evidence which showed he had his attache case with him when he went to Christina's house, that he sedated a dog in the yard with a tranquilizer, broke into the school next door, and called Christina in an attempt to lure her inside the school where he could murder her.

Continuing with the scene at the airport as testified to by Dr. Henry, he went to the American Airlines counter to upgrade his ticket to a day coach in order to leave earlier than scheduled. The ticket agent, Mr. Gene Zarr, noticed that Dr. Henry seemed exceedingly nervous and that he was trying to disguise himself since he was wearing a long-haired, ill-fitting black wig. Mr. Zarr also noted that when Dr. Henry reached into his pocket for money, the muscle of his arm wrinkled indicating that rather than being a very large, heavy-set man as he appeared, he was actually wearing a great deal of padding underneath his clothing.

Dr. Henry indicated that he wished to check the briefcase he was carrying. Mr. Zarr took the case, noted that the handle was broken and taped the claim check to it. Before it was placed on the conveyor belt, Dr. Henry demanded its return, indicating

that he would return it shortly. He then disappeared with the case, walking towards the men's room.

His suspicions aroused, Mr. Zarr went to his supervisor, Mr. Eugene Weber, and reported the incident. Mr. Weber became concerned and instructed Mr. Zarr that if the man should return with the briefcase, he was to tell him that it was too late to check it and that he would have to take the case to the departure gate, which would require an examination by the x-ray machine.

After 10 minutes, Dr. Henry returned wearing the trenchcoat he had previously been carrying. Mr. Zarr told him that he would have to check his bag at the departure gate. At no time did Mr. Zarr or any other person attempt to force Dr. Henry to carry the briefcase aboard or to take the bag from him. Rather than leave the airport, Dr. Henry took the attache case to the security gate [1] where it was passed through the screening device. The agent watched the screen, but unable to clearly identify the bag's contents, asked Dr. Henry to open the case. [2] Dr. Henry stated that he did not have the key and was thus unable to comply. A Tucson Airport Authority police officer stationed at the gate, unaware that American Airlines officials desired the bag to go through a security checkpoint prior to being loaded, told Dr. Henry that if he would not open his briefcase, he could not take it further and would have to return the bag to the ticket counter.

Persisting in his attempt to get the briefcase, unopened, aboard the aircraft, Dr. Henry returned to the counter and told Mr. Zarr that the security guard wanted the briefcase opened but that he was unable to do so because he did not have the key. Dr. Henry gave the briefcase to Mr. Zarr who asked that Dr. Henry meet him at the security checkpoint. Mr. Zarr, accompanied

---

1. At both the ticket counter and the security gate, signs are prominently displayed warning of federal inspection requirements. These signs note that all persons and articles passing the checkpoint are subject to inspection and that while inspection might be refused, the per-

son may not pass the checkpoint after so refusing. The security inspection procedure itself is public and may be easily observed.

2. This is normal procedure when the contents of baggage cannot be satisfactorily determined.

by Mr. Weber, proceeded with the briefcase to the gate where Dr. Henry was to be waiting. Dr. Henry however, did not wait at the gate as requested, but went directly to the boarding gate from which he hoped to depart.

Mr. Zarr and Mr. Weber approached Dr. Henry at the boarding gate and, after identifying himself, Mr. Weber explained that unless the briefcase was opened for inspection, it would not be permitted to be placed on the aircraft. Dr. Henry argued with Mr. Weber, repeatedly insisting that he had to have the bag with him in Dallas. Mr. Weber stated that the bag could not accompany him until its contents were determined. Dr. Henry reiterated that he had lost the key. Mr. Weber assured him that the case could be opened by using one of over 100 passkeys in possession of the airlines. Mr. Weber proposed that he would take the bag, open it with a passkey and forward it to Dallas on the next American Airlines flight after determining that the bag contained no hazardous materials. Mr. Weber also asked Dr. Henry for permission to force the lock in the event he was unable to open the case. Dr. Henry re-emphasized to Mr. Weber that he had to have the case in Dallas and agreed to Mr. Weber's proposal. Mr. Weber wrote on Dr. Henry's baggage stub "V/S (voluntary separation) 384, 1821," a notation signifying that Dr. Henry had been voluntarily separated from the bag which was to arrive on American Airlines flight 384 at 1821 hours. Dr. Henry then enplaned and departed Tucson International Airport.

Mr. Weber contacted George Boiko, Manager of Airport Services for American Airlines, and a member of the Airport Security Committee. Together the two men returned to the security checkpoint. Mr. Boiko was concerned because, as he testified, "We have become acutely aware of our responsibility to passengers to check and make sure nothing of a destructive nature would be on the aircraft ...", because of the danger of hijackings. The briefcase was again screened by the x-ray device. This time the operator was able to see a handgun inside. Mr. Weber and Mr. Boiko looked at the screen as well. Mr. Weber was able to discern something resembling a pair of pliers. Mr. Boiko saw these in addition to something resembling a spool of string or wire.

That the attache case contained a weapon was in itself a violation of federal law. See 18 U.S.C. Secs. 922(e) and 924(a). Of more immediate concern however, was the possibility that the string or wire was a fuse connected to an explosive device. Mr. Boiko, Mr. Weber and the Tucson Airport Authority police officers took the case to American's baggage service area where it was partially opened. By raising the lid approximately one inch and peering inside, both Mr. Boiko and Mr. Weber saw that the case did indeed contain a spool of string or wire. Alarmed that it might contain an explosive device, they took the bag outside and deposited it in a bomb basket, a device to protect against explosion.

The Pima County Sheriff's office explosive ordnance detail was summoned along with the Tucson Police Department's bomb detection dog squad. When the dogs arrived they were allowed to investigate the briefcase and responded positively to the presence of explosives.

The sheriff's officers, alerted to the presence of explosives by the dogs, inspected the briefcase. A .32 caliber revolver, extra ammunition, miscellaneous burglar tools, a number of explosives, fireworks and a birth certificate for a Terry Lee Cordell was found inside the case.

Based on this information, appellant was arrested upon deplaning in Dallas. When he was searched, several scraps of paper were found on him, including the plan of the murder which had been written down, a map of the City of Tucson, and a librium capsule, the identical drug which had been administered to the dog.

Dr. Henry was tried and convicted in the federal court in Tucson for delivering the firearm to a common carrier in violation of 18 U.S.C. Secs. 922(e) and 924(a). His conviction was confirmed on appeal in *United States v. Henry*, 615 F.2d 1223 (9th Cir. 1980).

Appellant contends the trial court erred in failing to suppress the evidence found in his attache case and on his person when he was arrested because the evidence was the product of an illegal search at the Tucson Airport. We do not agree. The contentions which he advances here are the same ones relied upon in *United States v. Henry*, supra, with the addition of a claim that the procedure at the airport abridged his constitutional right to travel. We find, as did the federal court, that he voluntarily consented to the search of the briefcase. His right to travel argument is irrelevant in the face of his consent.

Appellant contends that at the time he was indicted in the federal court, he was in the process of challenging extradition proceedings brought against him by the State of Arizona in Maryland and that the federal indictment was sought only to secure his removal to the District of Arizona and his arrest by Arizona state authorities. He argues that he was denied his right to contest the extradition proceedings and contends the trial court erred in refusing to dismiss the indictment on these grounds. We do not agree. As did the court in *United States v. Henry*, supra, at 1234, we find no support in the record for this argument. He was indicted in good faith by the federal government, a trial was held, and he was convicted.

Appellant contends the trial court erred in instructing the jury, relative to the crime of attempt, that abandonment of the crime was not a defense once there had been the formation of the intent coupled with an overt act.[3] We do not agree. See *Wiley v. State*, 237 Md. 560, 207 A.2d 478 (App.1965). Furthermore, we find this alleged error to have been invited since the instruction given was the one offered by appellant.

Appellant attacks the trial court's failure to grant his motion for mistrial when the state introduced evidence that part of Christina's testimony was the result of her recollection while under hypnosis.[4] Appellant did not question the competency of such testimony at trial,[5] but instead contended it was irrelevant because he had not yet attacked the credibility of that particular evidence.

Assuming that error was committed, it was harmless beyond a reasonable doubt because appellant confessed to the crime of attempted murder from the witness stand. He described the events that occurred from the initial plan to his departure from Tucson and subsequent arrest in Dallas. He admitted his intent to kill her when he left Dallas for Tucson in his disguise, thereby establishing the intent to kill plus an overt act. When he arrived in Tucson, the intent sill existed and when he deplaned another overt act occurred. The crime of attempt was complete. See A.R.S. Sec. 13–108;[6] *State v. Mandel*, 78 Ariz. 226, 278 P.2d 413 (1954).

Affirmed.

HATHAWAY, C. J., and RICHMOND, J., concur.

---

3. Appellant was tried under the criminal code prior to its extensive revision on October 1, 1978.

4. While under hypnosis, she remembered that when she saw appellant across the street the morning he came to kill her, he was wearing a disguise and carrying a briefcase with a broken handle.

5. See *State v. La Mountain*, 125 Ariz. 547, 611 P.2d 551 (1980).

6. All references are to the criminal code as it existed prior to its extensive revision on October 1, 1978.