**UNITED STATES**

v.

**Major William E. COLLIER, 200–50–0355 United States Air Force.**

**ACM 28911.**

U.S. Air Force Court of Military Review.

Sentence Adjudged 24 Aug. 1990.

Decided 23 Oct. 1992.

502

Appellate Counsel for the Appellant: Captain David D. Jividen (argued), Edward Bingham Miller (argued), Colonel Jeffrey R. Owens, Major Ronald G. Morgan, and Major Mary C. Yastishock.

Appellate Counsel for the United States: Major Paul H. Blackwell, Jr. (argued), Colonel William R. Dugan, Jr., and Lieutenant Colonel Brenda J. Hollis.

Before LEONARD, JAMES, and JOHNSON, Appellate Military Judges.

## OPINION OF THE COURT

JAMES, Judge:

This remarkable case is about attempts, abandonment, admissions, and adultery. Major Collier was convicted of attempting to murder his wife, five false statements in connection with prescriptions for drugs, and adultery, which motivated the attempted murder.[1] He was acquitted of one specification which alleged that he presented false identification for the purpose of buying explosives. He was sentenced to be dismissed from the service and confined for 15 years. On appeal he renews his objection to admission of some of his own statements, contests the sufficiency of the evidence on the attempted murder and adultery, claims to have been denied his right to effective representation, and urges that the sentence is too severe. We address each of his assignments below,[2] taking his evidentiary issues first because we cannot assess the sufficiency of the evidence until we know whether the evidence was properly admitted. We consider the abandonment defense as part of our obligatory review of the sufficiency of the evidence. We find no error, and we affirm the findings and sentence.

Major Collier was an anesthetist. His wife was unaware that he had become infatuated with Captain G, a nurse in the same hospital to which he was assigned. The relationship developed into an affair. Eventually, according to the prosecution's theory, Major Collier decided to kill his wife by poisoning her.

Most of the facts are not in dispute. Major Collier obtained some Halcion[3] (a sedative) and put it into a pudding for his wife to consume. She did, unaware, of course. After she was asleep, Major Collier also injected into her some ketamine (an anesthetic).[4] He inserted into his wife a nasogastric tube and used it to put two bottles of a Tylenol elixir[5] into her stomach.

Tylenol in large enough doses damages the liver. Major Collier maintained that he put into his wife's stomach about 5 grams of the 7.6 grams of Tylenol contained in the two bottles. Other evidence at trial showed that a third bottle of 4 grams was available but unused, as was a bottle of Tylenol tablets. The toxic dosage would be 10 to 15 grams and the lethal dosage 15 to

---

1. Violations of Articles 80, 107, and 134, UCMJ, 10 U.S.C. §§ 880, 907, and 934 (1988), respectively.

2. We appreciate the help of the excellent briefs and arguments of counsel for both parties.

3. Halcion is a hypnotic used in management of sleep disorders. *Physician's Desk Reference,* 2226–2228 (44th ed. 1990).

4. Marketed under the trade name Ketalar, ketamine "is a rapid acting general anesthetic producing an anesthetic state characterized by profound analgesia." *Physician's Desk Reference* 1616–18 (44th ed. 1990).

5. The testimony shows Tylenol elixir to be a liquid form of the popular analgesic. *See Physician's Desk Reference* 1277–82 (44th ed. 1990).

25 grams, depending on physiological and medical attributes of the victim.

Mrs. Collier regained consciousness and showed the discomforting effects of the medication. Major Collier then went to his hospital to get some Mucomyst, the antidote for a Tylenol overdose.[6] In his absence, his wife summoned help from one of Major Collier's colleagues and was admitted to the same hospital. She survived, but not without emergency treatment and a day in an intensive care ward.

## I. Admissions

Major Collier invites our attention to the admission of his statements to five doctors. He argued that the statements should have been excluded as the products of unwarned interrogations. They arose after Major Collier returned to his home and learned that Mrs. Collier had been hospitalized. It is important to treat each one separately.

■ We must first determine the proper standard of review for each of the statements. Our examination of military and federal case law indicates that the standard of review depends on what the specific issue is. A due process issue requires de novo, plenary review. *Miller v. Fenton,* 474 U.S. 104, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985) (federal habeas corpus); *Arizona v. Fulminante,* — U.S. —, —, 111 S.Ct. 1246, 1252, 113 L.Ed.2d 302, 315 (1991) (direct appeal). We will examine voluntariness de novo.[7] When we examine voluntariness, we consider it to be a legal issue. We may accept the military judge's findings of facts where we find them to be supported by the record, or we may find the facts for ourselves. Article 66(c), UCMJ, 10 U.S.C. § 866(c) (1988); *United States v. Cole,* 31 M.J. 270 (C.M.A.1990).

Once the facts are established, we will examine the totality of the circumstances to decide whether the statements were voluntary. *Fulminante,* — U.S. at —, 111 S.Ct. at 1251. Whether the customary warnings were given is a question of fact. S. Childress & M. Davis, 2 *Federal Standards of Review* § 11.13 (1992). That issue is involved only in the last of Major Collier's admissions, for in none of the others was there any contention that warnings were given. We consider de novo whether warnings were required. *See United States v. Ravenel,* 26 M.J. 344, 352 (C.M.A. 1988) (Cox, J., concurring).

■ Major Collier initiated the first conversation when he called the hospital by telephone, speaking to the doctor (a captain) whose wife Major Collier had encountered at home, tending the Collier children. By this time, Mrs. Collier had told the doctors that she thought that Major Collier had drugged her. The doctor described the conversation:

> I said, "Hello," ... he said, "Do they know what's going on with [Mrs. Collier]?" ... I said, "No." And there was kind of a pause and he says, "Well, what do they think is going on with her?" And I says "Well,"—I said, "Bill we don't really know. Why don't you come on in and help us figure out what is going on? We don't know what is going on with her." And then there was kind of a lag and he didn't say anything and I didn't say anything. Then I said, "Well, Bill, [Mrs. Collier] thinks that you may have given her something." Then there was a pause and he goes, "I did. I gave her Tylenol. She needs N-acetylcysteine or Mucomyst." And then I asked him,

---

**6.** *Id.*

**7.** *See* S. Childress & M. Davis, 2 *Federal Standards of Review* § 11.13 (1992) (hereafter "Childress & Davis"). We recognize that "voluntariness" might also include violations of the statutory warnings requirement and technical violations of Mil.R.Evid. 305, and that those issues might not require de novo review. *But cf. United States v. Clay,* 1 U.S.C.M.A. 74, 1 C.M.R. 74, 77 (1951) (rights not be compelled to incriminate oneself and to have involuntary confessions excluded are part of "military due pro-

cess"). There is some suggestion that we might review a trial judge's decision on those points for an abuse of discretion. *See United States v. Harman,* 12 U.S.C.M.A. 180, 30 C.M.R. 180, 186 (1961); *United States v. Shepard,* 34 M.J. 583, 589 (A.C.M.R.1992). That standard is typical for review of "evidence calls." Childress & Davis, *supra,* § 11.13. However, we are not confident of that standard, and, required to examine the constitutional aspects de novo in any case, we will simply review all de novo to be sure that we dispose of the issue.

"Well, how much did you give her?" And he says, "I gave her five grams." I says, "Are you sure?" And he says, "Yes, I gave her five grams."

The captain gave no warning to Major Collier about his rights. These admissions were made under circumstances that are obviously not custodial, and no warnings were required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Article 31, UCMJ, 10 U.S.C. § 831 (1988), requires similar warnings, too, but no Article 31 warnings were required because the captain had no law enforcement or disciplinary role and was not investigating Major Collier. *United States v. Loukas*, 29 M.J. 385 (C.M.A.1990); *United States v. Fisher*, 21 U.S.C.M.A. 223, 44 C.M.R. 277 (1972).[8] There are no attributes of involuntariness. The statement was admissible. *See generally* Mil.R.Evid. 304(a), (c)(3), 305.

■ Major Collier also initiated the second conversation. The doctor to whom he had first spoken feared that Major Collier might be suicidal, and he told Major Collier's supervisor. A hunt ensued in which civilian and military police were asked to help, but the record shows no involvement by the police in any relevant events. When Major Collier was found at his paramour's residence, his superior, a colonel, went there and drove the car in which both returned to the hospital. The colonel feared that Major Collier might be suicidal even as they rode together in his car. During the trip, Major Collier asked whether military or civilian authorities would try his case and remarked that he felt that he deserved punishment, but he did not disclose why. The statements at most suggest a guilty state of mind, but we consider them admissions to dispose of the issue. These statements were spontaneous and voluntary, and there was no questioning. No warning was required, regardless whether the set-

ting might be regarded as custodial or official. Mil.R.Evid. 304(a), (c)(3), 305(c). These statements were also admissible.

After the pair arrived at the hospital, the colonel told security guards to watch Major Collier and not to permit him to leave because of the colonel's continuing concern that Major Collier might be suicidal. The record does not disclose whether Major Collier knew of that instruction, but we will assume that he did. Meanwhile, the colonel arranged to have Major Collier admitted to the psychiatric ward. Afterward, the colonel visited Mrs. Collier. She was concerned that Major Collier might have given her more than they knew. The colonel went directly to Major Collier and asked Major Collier whether he had given Mrs. Collier anything else.

I told him, you don't have to answer this question, but [Mrs. Collier] is very concerned that you may have given her something else that's toxic that they haven't picked up. And he said, ..., "Let [her] know that ... I only gave her the five grams of Tylenol."

The presence of the guards and the colonel's question make a different matter of this statement.

The military judge concluded that "the accused was never in custody," but we do not agree. *See United States v. Cole*, 31 M.J. 270 (C.M.A.1990). The prosecution has the burden at trial of proving by a preponderance that the suspect was not in custody when that is at issue, Mil.R.Evid. 304(e), but the record is not at all clear. We assume that Major Collier was now deprived of liberty and in custody. *See* R.C.M. 305(d)(1)(A).

■ The fact that the questioner is a superior of the suspect normally yields a "presumption" that the superior is acting in a command disciplinary capacity. *Loukas*, 29 M.J. at 389 n.*. However, the "presumption" is rebuttable, *id.*, and the

---

8. *Fisher* involves a doctor questioning a suspect-patient. However, the *Fisher* approach seems equally satisfactory when the suspect is questioned by the doctor about diagnostic information for the treatment of a third party. *See United States v. Jones*, 26 M.J. 353, 356–57 (C.M.A.1988).

We also note that the doctor's speeches were ambiguous, not obviously questions. However, they are of a conversational form likely to induce a reply, and we assume them to have been questions. *See United States v. Byers*, 26 M.J. 132 (C.M.A.1988).

military judge at trial concluded that the question was not prompted by law enforcement motives but was instead asked solely to assure correct medical treatment of Mrs. Collier. There is support in the record for that finding, and we adopt it. Thus, the colonel was not acting in the kind of law enforcement or disciplinary capacity that would trigger either of the warning requirements. Accordingly, the military judge found that no warnings were required, *Miranda,* 384 U.S. 436, 86 S.Ct. 1602; *Loukas,* 29 M.J. 385; *Fisher,* 21 U.S.C.M.A. 223, 44 C.M.R. 277, and admitted the statement. We agree that no warnings were required. The statement was voluntary, and it too was admissible.

The colonel had summoned psychiatrists to have Major Collier admitted for observation.[9] The two psychiatrists (both captains) interviewed Major Collier solely to make a psychiatric assessment incidental to the admission. Their first question was, "What brings you here today?" or words to that effect. Major Collier replied, "I tried to kill my wife," and then told them the details. The two doctors were junior in rank to their patient, and there is no suggestion in the record that their interest was other than purely medical. *See United States v. Moore,* 32 M.J. 56, 60–61 (C.M.A.1991); *United States v. Malumphy,* 13 U.S.C.M.A. 60, 32 C.M.R. 60, 61–62 (1962); *United States v. Baker,* 11 U.S.C.M.A. 313, 29 C.M.R. 129 (1960); *United States v. Webb,* 755 F.2d 382 (5th Cir.1985). They had no contact with the police, but they advised Major Collier that he had no confidentiality and that his statements might be used against him.[10] Such a warning is obviously inadequate if Miranda

or Article 31 warnings were required. The military judge found at trial that the two captains had only a medical purpose and admitted this statement, too. We agree. No warnings were required, and the resulting statement was voluntary and admissible.

Finally, on the next day the staff psychiatrist of the ward to which Major Collier was admitted began his clinical interviews. Once again, Major Collier repeated how he had put the Tylenol into his wife's stomach. The staff psychiatrist, also a major, said:

> I started by initially informing Major Collier of his Article 31 rights at which time I stated this is similar to the Miranda rights. I said that he had no confidentiality in that setting, that whatever he said would be recorded and could be used later. I also told him that he had the right not to continue the interview without having a lawyer present. He could refuse to say any questions—answer any questions.

The record does not show that all the required warnings were given, but the record is ambiguous as to the objection of the defense to this statement. The defense's written suppression motion seems to concede that adequate warnings were given and to object to this statement solely as a derivative of prior illegalities. However, the military judge never required the defense to state its objections with specificity, *cf.* Mil.R.Evid. 304(d)(3), (e); S. Saltzburg et al., *Military Rules of Evidence Manual* 163 (3d ed. 1991), and so the defense objection must be taken as a general objection,[11]

---

**9.** There is a controversy in the record about whether one who is admitted for psychiatric treatment is in custody or free to leave. The controversy was never resolved. We continue to assume that Major Collier was not free to leave and that he knew it.

**10.** *See generally* Mil.R.Evid. 501(d); *United States v. Toledo,* 25 M.J. 270 (C.M.A.1987).

**11.** We are chagrined that neither the military judge nor trial counsel sought the obvious benefits of Mil.R.Evid. 304(d)(3) and (e). The defense briefed all its objections to all the state-

ments in a single motion. The military judge took all the evidence on the motion at once, and the arguments on all were heard together. The value of requiring specificity is perhaps more apparent to us on appeal than it was at trial, but we are surprised that neither the trial counsel nor the military judge valued the greater orderliness that would follow use of the specificity rule.

We also note that the military judge, at trial counsel's request and with defense consent, agreed in this case to hear testimony on the merits of the case at the same time that witnesses testified in the suppression hearing, to ac-

and the prosecution's burden was to satisfy all parts of the foundation, including the adequacy of the warning, if warnings were required.

However, the lesson in *Loukas* is that one must examine the purpose of the questions before deciding whether warnings are required. The staff psychiatrist's testimony makes clear that his only interest was in identifying and attending to the psychiatric needs of his patient. He had no disciplinary or command relationship to Major Collier, and he was not involved in the police investigation. No warnings were required. The statement was voluntary and admissible.

These statements were all admitted over objection at trial. We find the objections to have been properly overruled. However, reasonable lawyers and judges might disagree, and in case we are mistaken, we will assess the effect of any error, for no relief is warranted if any error had no prejudicial impact. Article 59(a), UCMJ, 10 U.S.C. § 859(a) (1988). We must be certain beyond a reasonable doubt because the issue is constitutional in any instances involving custodial interrogation. *Fulminante,* — U.S. ——, 111 S.Ct. 1246; *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *United States v. Ward,* 1 M.J. 176 (C.M.A.1975). *See generally* Childress & Davis, *supra,* § 7.03. We will apply that strict standard to all the statements because this case lends itself to such a simple approach, even though the standard may be unnecessarily strict in some of the instances.

■ Major Collier's paramour, Captain G, was compelled to testify under a grant of immunity. She testified that Major Collier called her and later came to her home after he learned that Mrs. Collier had been hospitalized and that he told her in both conversations that he had tried to kill his wife, describing the method. Thus, the statements that he made to the doctors were little more than the court-martial

would have heard from Captain G regardless whether the statements to the doctors were admitted. We hold that, if admitting any of the statements to the doctors was error, it was harmless beyond a reasonable doubt.

## II. Effective Assistance of Counsel

■ An accused in a criminal case has a constitutional right to the assistance of counsel, U.S. Const. amend. VI, and that right may be denied if counsel is ineffective. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *See generally United States v. Scott,* 24 M.J. 186 (C.M.A.1987); *United States v. Barnard,* 32 M.J. 530 (A.F.C.M.R.1990), *pet. denied,* 33 M.J. 484 (C.M.A.1991). Major Collier has two complaints about the effectiveness of his defense counsel at trial. First, he complains that his counsel should have moved for a finding of not guilty at the end of the prosecution's case. *See generally* R.C.M. 917. Second, Major Collier complains that the defense counsel elicited damaging testimony overlooked by trial counsel. We find no merit in either assignment.

### A. Motion for Finding of Not Guilty

■ Major Collier's first point restates his conclusion that the prosecution did not adequately prove the specific intent to kill. He argues that there is no risk to a motion for a finding of not guilty. Thus, he argues, there can be no tactical or strategic reason not to make one. That argument entitles him to no relief under *Strickland,* for we find no error.

There are several reasons not to make such a motion. Counsel should refrain from frivolous measures at trial, just as on appeal. Air Force Rules of Professional Responsibility, rule 3.1 (4 December 1989); *accord,* ABA Model Code of Professional Conduct, rule 3.1 (1983); *cf.* Air Force Rules of Professional Responsibility, rule

---

commodate the witnesses by avoiding the need to call them twice. The defense agreed that trial counsel had a good reason as to two: They were then vulnerable for deployment during Operation Desert Storm. However, there was,

inevitably, disagreement about the extent of the defense concurrence as to other witnesses, and the procedure muddled the evidence, though less than we have seen in other examples. We do not encourage this shortcut.

3.2 (4 December 1989) (expediting litigation); *accord,* ABA Model Code of Professional Conduct, rule 3.2 (1983). This is not to say that a motion for a finding of not guilty is always frivolous. Instead, we emphasize that only in rare instances is the motion really warranted. That is because the standard for the motion is as generous to the prosecution as any we know. *See* R.C.M. 917(d). For such a motion to benefit the accused implies that the prosecution has come to an unusual disaster. Furthermore, the prosecution may reopen its case to correct any oversight revealed by such a motion, R.C.M. 913(c)(5), and so the motion may contribute to the strength of the prosecution's case.

Of course, we do not decide Major Collier's argument by what is typical, but instead we look at the state of the evidence when the prosecution rested its case, to evaluate counsel's conduct "from counsel's own perspective." *United States v. Brothers,* 30 M.J. 289, 291 (C.M.A.1990). When we do so, we find that there was ample evidence from which the military judge could conclude, beyond a reasonable doubt, that Major Collier intended to kill his wife and attempted to do so.[12] Thus, it was within trial defense counsel's intelligent and responsible discretion to refrain from making the motion. *See generally* ABA Standards for the Administration of Criminal Justice, Standards Relating to the Defense Function, 4–5.2(b) (1986) (control and direction of the case). Had it been properly decided, the motion would only have delayed the trial. The choice not to make the motion can hardly be said to rise to the kind of deficient performance described by *Strickland.*

### B. Cross–Examination

Whenever an advocate begins cross-examination, there is always some risk that the result will be damaging. Major Collier's view of the record is that only the defense counsel elicited that Major Collier believed the Tylenol he gave his wife to have been a fatal dosage. From that prem-

ise he concludes that the testimony so elicited must have been the fulcrum on which the military judge decided that Major Collier intended to kill his wife. We think Major Collier's argument fails for two reasons.

First, Major Collier mistakenly implies that it was necessary for the prosecution to prove that he administered a dosage he thought to be fatal. Instead, however, an attempt may be proven by showing "an act . . . amounting to more than mere preparation and tending, even though failing, to effect its commission." Article 80(a), UCMJ, 10 U.S.C. § 880(a) (1988). Thus, in pure legal theory it might be said that the attempt in this case was completed much earlier than administration of *any* Tylenol, that it was completed when he served Mrs. Collier the pudding, when he injected more anesthetic into her, or when he inserted the tube, perhaps even before he put the first drop of Tylenol into it. Certainly the attempt was completed at least when the last drop of Tylenol went down the tube. *See* Manual For Courts–Martial, United States (hereafter MCM), Part IV, paragraph 4c(2) (1984). Thus, it was not counsel's cross-examination that got Major Collier convicted.

Second, we disagree with Major Collier's reading of the record. Captain G, the paramour, recounted that Major Collier twice stated that he had tried to kill his wife. We infer from his statements that he did believe that he had used enough. Those two admissions moot any controversy about who proved that Major Collier believed he had used a fatal dosage.

Finally, we do not hold the view urged by Major Collier that any gaffe by counsel during cross-examination constitutes ineffectiveness. Cross-examination is widely, perhaps universally acknowledged to be a delicate art, and the risk that it will go sour is well known. Yet a lawyer must sometimes run that risk, for the reward upon a

---

**12.** Our analysis of this assignment necessarily involves the same consideration we give to in- tent below.

successful examination might offset the danger.[13]

We do not find the examination to constitute the kind of deficiency that makes the adversarial process unreliable. Major Collier was not deprived of the effective assistance of defense counsel, and his trial gives us every confidence in the reliability of the result.

### III. Sufficiency of Evidence of Attempted Murder

██ We address two points about the sufficiency of the evidence of attempted murder. First, Major Collier argues that the evidence does not show the required specific intent to kill. He posits that, as a doctor, he probably knew that neither 5 nor 7.6 grams of Tylenol would be fatal, and he invites us to deduce that he must not have intended to kill if he did not administer more. He adds that he would have known Tylenol to be a poor choice, especially under the circumstances. From these premises one might conclude that Major Collier never committed the required overt act. We add another point: he argued at trial that the evidence does not refute his defense that he voluntarily abandoned any such attempt.[14]

### A. Specific Intent to Kill

Major Collier's first theory is consistent with his excellent reputation among his medical colleagues and with his psychiatrist's assessment of his personality: Major Collier is the kind of person who would either know or look up the required dosage. If he had intended to kill his wife, the theory runs, he would not have made a mistake about the dosage needed.

Major Collier's second theory is also based on his medical knowledge. A Tylenol overdose would have resulted in liver damage that would have killed slowly. During that period, symptoms would eventually have led to the discovery of the ailment, and the victim would have been conscious and able to say that she had not taken any of the medication voluntarily. Worse yet, the illness would have occurred when Major Collier knew his own brother and sister would be visiting in his house. Finally, he had access to many other, much more lethal medications that might have been better choices. These factors, he argues, make it more probable that he lacked the required intent.

Major Collier's theories invite the kind of endless rhetorical questions on which appeals thrive, but they do not make his own admissions vanish. Major Collier repeatedly stated on the day Mrs. Collier was hospitalized that he had tried to kill his wife. His later rationalizations are unpersuasive.[15] Furthermore, once we conclude that Major Collier intended to kill, we easily find that his actions went well beyond preparation and included the required overt act that tended to effect the murder. *See generally United States v. Jones*, 32 M.J. 430 (C.M.A.1991); *United States v. Church*, 32 M.J. 70 (C.M.A.1991). Why this doctor would have believed this dosage to have been adequate for that purpose with this victim and whether that belief was scientifically correct are mysteries that need not be resolved to decide this appeal.

### B. The Defense of Abandonment

██ Finally, we address Major Collier's theory at trial that he voluntarily abandoned his attempt to kill his wife.

---

13. Our disposition of this issue should not be misconstrued to encourage off-the-cuff cross-examinations. We subscribe to the universal truth that cross-examination, like any other part of a trial, must be planned carefully in advance whenever and to the full extent that it is possible to do so. We share the view that it is rarely wise to ask a question the answer to which one cannot predict with some assurance will fall within a range of acceptable replies. However, we also know that cross-examination is one of the most artistic parts of an advocate's repertoire, not as tightly controllable and therefore more subtle and less certain and less susceptible to execution as planned than any of the others. The *Strickland* standard permits fallibility.

14. Major Collier has not renewed this theory in his appellate pleadings, but he relied in part upon it at trial, and we consider it now as part of our examination of the record under Article 66(c), UCMJ, 10 U.S.C. § 866(c) (1988).

15. One of the psychiatrists who testified referred to some of Major Collier's reactions as "intellectualizing."

Abandonment is a defense to a charge of attempt. *See generally United States v. Rios*, 33 M.J. 436 (C.M.A.1991); *United States v. Byrd*, 24 M.J. 286 (C.M.A.1987); *United States v. Schoof*, 34 M.J. 811 (N.M.C.M.R.1992); *United States v. Walther*, 30 M.J. 829 (N.M.C.M.R.1990). Given that it is an affirmative defense, *Byrd*, 24 M.J. at 292, the burden rests upon the prosecution, once it is put into controversy, to rebut the defense beyond a reasonable doubt. R.C.M. 916(b). There is little doubt that the defense was put into controversy. The problem now is to determine the limits of the defense in this case.

We note at the outset that it is easily possible to confuse the abandonment defense with absence of intent or with the theory that the criminal venture was forsaken before the necessary overt act [16] was committed. Those two situations require no defense, for in neither is there a punishable attempt:

> It has been observed that "anywhere between the conception of the intent and the overt act toward its commission, there is room for repentance; and the law in its beneficence extends the hand of forgiveness." However, that language should not be taken too seriously, for if the overt act has not yet occurred there is nothing to forgive.

W. LaFave and A. Scott, Jr., *Criminal Law* 447–48 (1972) (hereafter LaFave) (quoting from *States v. Hayes*, 78 Mo. 307, 317 (1883)). *But see State v. Henry*, 128 Ariz. 204, 624 P.2d 882 (1981). We refer to this confusion as the mistake of viewing this defense as chronological. We also note that the label itself somehow implies a temporal aspect, as if it is sometimes too late to have the benefit of the defense. Indeed, that is true, as we discuss below, but it is not because of chronology. The existence of abandonment as a defense necessarily implies that a punishable attempt precedes it. *See Schoof*, 34 M.J. 811; *Walther*, 30 M.J. 829.

LaFave notes that *in*voluntary abandonment is no defense. Thus, one whose venture is frustrated by unforeseen events or difficulties does not have the benefit of the defense. *See Byrd*, 24 M.J. 286. Included in this category are those ventures which are stopped by the appearance of police, or because police or the victim learn of the plan. *Id.; State v. Gray*, 19 Nev. 212, 8 P. 456, 459–60 (1885). The American Law Institute's Model Penal Code recognizes as defenses those withdrawals that occur "under circumstances manifesting a complete and voluntary renunciation of ... criminal purpose." Model Penal Code § 5.01(4) (1962), as quoted at *Rios*, 33 M.J. at 440. LaFave notes, however, that "it is impossible to generalize about the current status of such a defense; one recent survey concluded that the issue remains an open question in most jurisdictions, and in some the cases in point cannot be reconciled." LaFave, *supra*, at 449. It is presently (at least in this jurisdiction) a defense without clearly defined limits, *United States v. Rios*, 32 M.J. 501, 502 (A.C.M.R.1990), *rev'd*, 33 M.J. 436 (C.M.A. 1991), but we are confident that it does have limits.

There appears to be some agreement that it can be too late to abandon a criminal venture. "Too late" can be defined by external events, like the appearance of police, or it can be defined by attributes of the acts of the accused and their consequences. Similarly, the attempt can go so far that it becomes uncontrollable, and that also abates the defense:

> If an attempt be voluntarily ... abandoned before the act is put in process of final execution, ... then this is a defense. But it is otherwise when the process of execution is in such condition that it proceeds in its natural course, without the attempter's agency, until it either succeeds or miscarries. In such a case, no abandonment of the attempt, and no withdrawal from its superintendence, can screen the guilty party from the results.

Wharton, *Criminal Law* § 187, as quoted at *State v. Gray*, 19 Nev. 212, 8 P. 456, 459 (1885). *Cf. United States v. Joyce*, 693 F.2d 838, 841 (8th Cir.1982) (abandonment

---

**16.** *See generally* MCM Part IV, paragraph 4c(2)

(1984).

"prior to the commission of a necessary and substantial step"); *United States v. Bussey*, 507 F.2d 1096, 1098 (9th Cir.1974) ("abandonment of an attempt which has ... proceeded well beyond preparation ... will not bar a conviction"). Pertinent to this case is LaFave's comment:

> Assuming a defense of voluntary abandonment, does there come a point at which it is too late for the defendant to withdraw? Obviously there must, for it would hardly do to excuse the defendant from attempted murder after he had wounded the victim or, indeed, after he had fired and missed.

LaFave, *supra*, at 451. *See also* W. LaFave & A. Scott, Jr., 2 *Substantive Criminal Law* § 6.2(b) (1986). Perkins agrees:

> Attempted murder cannot be purged [by abandonment] after the victim has been wounded, no matter what may cause the plan to be abandoned.

R. Perkins & R. Boyce, *Criminal Law* 656 (3d ed. 1982).

■ We find this amorphous defense to be largely a matter of social policy not yet defined in our jurisdiction, a blank slate on which we must write to fulfil our responsibility under Article 66(c). We favor the views expressed by Perkins and LaFave about attempted murder cases in which injury results. *Cf. People v. Dillon*, 34 Cal.3d 441, 454, 194 Cal.Rptr. 390, 668 P.2d 697 (1983). We hold that when an attempted murder has proceeded so far that injury results, abandonment is no longer a defense.

■ By the time he went for the antidote, Major Collier had completed a long chain of prefatory acts in a manner that show his murderous intent. The crime was complete, even if the homicide was not, long before he went for an antidote and even well before he stopped pouring Tylenol into his wife's stomach. The time to have abandoned the venture was before the last of the Tylenol went down the nasogastric tube because Mrs. Collier was already seriously injured. Having survived her drugged sleep, she awoke disoriented, with impaired vision, difficulty walking, and nausea, a very sick person. Once she finally got herself to medical care and the problem was identified, an antidote was required. She spent a day under intensive care, concerned that she might die. Her injuries negate the defense.

## C. Conclusions

"The test for [legal sufficiency] is whether, considering the evidence in the light most favorable to the prosecution, a reasonable fact-finder could have found all the essential elements beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 324 (C.M.A.1987) (citing *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). The test for factual sufficiency is "whether, [we] are [ourselves] convinced of the accused's guilt beyond a reasonable doubt." *Turner*, 25 M.J. at 325.

We have no doubt at all that the evidence was legally sufficient. With the evidence considered in the light most favorable to the prosecution, the evidence is virtually overwhelming. Furthermore, we are ourselves convinced beyond a reasonable doubt that Major Collier attempted to kill his wife. The evidence shows a chain of deliberate acts that came within grams of putting a toxic dose of medication into Mrs. Collier's body. Major Collier disclosed his intent to kill clearly and repeatedly while Mrs. Collier was in the hospital. His belated rationalization of his behavior lacks persuasiveness, and we do not believe it.

## IV. Sufficiency of Evidence of Adultery

■ Major Collier correctly asserts that proof of adultery under Article 134, UCMJ, 10 U.S.C. § 934 (1988), requires proof of either prejudice to good order and discipline or that the conduct was of a nature to bring discredit to the service. MCM, Part IV, paragraphs 60c(2)–(3), 62b(3). *See generally United States v. Hickson*, 22 M.J. 146 (C.M.A.1986). From that premise he argues that there could have been shown neither such effect in his case because his affair with Captain G was discreet and secret and did not come to anyone's attention until, of course, the secrets of his life unraveled after his wife's hospitalization. However, his theory is defeated by the fact that his secrets have come to the public's view, *cf. United States*

v. *Berry,* 6 U.S.C.M.A. 609, 20 C.M.R. 325 (1956); *United States v. Linnear,* 16 M.J. 628 (A.F.C.M.R.1983), and by his paramour's military status. Her participation showed her dramatically that this officer lacked sound moral fiber, self-discipline, and similar qualities required of a good soldier and thereby gave her the fodder from which to draw inferences about officers generally, however subconscious, discrediting to the service and prejudicial to good order and discipline. Finally, it was the adulterous affair that produced Major Collier's motive to murder. That his conduct supplied such a powerful incentive to commit another crime surely makes it discrediting to the service and prejudicial to good order.

### V. Sentence

 Major Collier also complains that the sentence is unduly severe. We have examined the record, the findings, and the sentence, giving due consideration to the characteristics of this offender and to the crimes of which he was convicted. *United States v. Healy,* 26 M.J. 394 (C.M.A.1988); *United States v. Wingart,* 27 M.J. 128 (C.M.A.1988); *United States v. Snelling,* 14 M.J. 267, 268 (C.M.A.1982); *United States v. Ciulla,* 29 M.J. 868 (A.F.C.M.R. 1989), *aff'd,* 32 M.J. 186 (C.M.A.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 172, 116 L.Ed.2d 135 (1991). We note the mitigating aspects of this case. For example, Major Collier was an excellent physician with a commendable service record. However, his crimes were deadly and required planning and repeated acts, after each of which he had the chance to quit. We are satisfied that the sentence is not inappropriate, as adjudged and as approved.

The findings and the sentence are, on the basis of the entire record, correct in law and fact, and they are

AFFIRMED.

Senior Judge LEONARD and Judge JOHNSON concur.