**UNITED STATES**

v.

**Staff Sergeant Lawrence A. THOMAS, FR061–44–2841, United States Air Force.**

**No. ACM 30068.**

U.S. Air Force Court of Military Review.

Sentence Adjudged 30 April 1992.

Decided 8 Nov. 1993.

Appellate Counsel for the Appellant: Mr. Jordan B. Yeager (argued), Colonel Terry J. Woodhouse, Lieutenant Colonel Frank J. Spinner, Major Mary C. Yastishock, Captain Robert I. Smith, and Mr. James R. Klimaski.

Appellate Counsel for the United States: Captain Jules D. Silberberg (argued), Colonel Richard L. Purdon, Colonel Jeffery T. Infelise, Lieutenant Colonel Thomas E. Schlegel, Lieutenant Colonel Robert Williams, Major Paul H. Blackwell, Jr., and Captain Carlos L. McDade.

Before JOHNSON, HEIMBURG, and YOUNG, Appellate Military Judges.

---

**OPINION OF THE COURT**

JOHNSON, Senior Judge:

Pursuant to his pleas of guilty, Sergeant Thomas was convicted of absence without authority from 23 to 26 December 1991 and from 16 to 17 January 1992.[1] Contrary to his pleas, he was also convicted of using cocaine, violating a lawful regulation by possessing drug paraphernalia, and dishonorably failing to pay two just debts.[2] He was sentenced to a bad-conduct discharge, confinement for 27 months, and reduction to E–1. He raises two issues before us. We find that he was not denied the effective assistance of counsel, but we set aside his conviction of dishonorably failing to pay two just debts because of factual insufficiency of the evidence. Accordingly, we reassess the sentence.

### I. FACTS

Sergeant Thomas was an aircraft maintenance technician in the Air Force Reserve, assigned to a unit at McGuire Air Force Base, New Jersey. He was called to active duty in August 1991 and ordered to report for a 90–day tour of duty at Andrews Air Force Base, Maryland, near Washington, D.C.

On 24 October 1991, Renatta King, a civilian, reported to military authorities at Andrews that she had used crack cocaine the night before in Washington, D.C., and in a billeting room at Andrews, with an Air Force member named "Larry Thomas." She gave a written statement to agents of the Air Force Office of Special Investigations (OSI), showed them where the room was located, described Larry Thomas' car, and described a brown paper bag containing five small plastic baggies in which the cocaine had been packaged. She identified Sergeant Thomas in a lineup at his Article 32 investigation and at trial, where she testified under a grant of immunity.

The paper bag, baggies, and some straws that had been used as pipe cleaners were found in a trash can outside the billeting

---

1. Article 86, UCMJ; MCM, Part IV, paragraph 10 (1984).

2. Articles 112a, 92, 134, UCMJ; MCM, Part IV, paragraphs 37, 16, 71 (1984).

building. OSI agents determined the billeting room was assigned to Sergeant Thomas, and that his truck matched Ms. King's description. She testified at trial she used cocaine with Sergeant Thomas in Washington and at Andrews over a 5- to 8-hour period on 24 October 1991. A urine sample was obtained from Sergeant Thomas by search authorization. The urinalysis results indicated the presence of cocaine metabolites in Sergeant Thomas' urine at a level of 153,500 nanograms per milliliter, clearly higher than the DoD standard for reporting positive urinalysis results, 150 nanograms per milliliter.

Sergeant Thomas occupied a billeting room at Andrews from 28 August 1991 through 5 November 1991. He left without paying his bill of $552.00. He also occupied a billeting room at McGuire from 25 April 1991 through 31 July 1991, and during November and December 1991, but he never paid bills totaling $1,083.98. He paid nothing on either debt until they were involuntarily collected from his military pay.

The defense attacked Ms. King's credibility, challenged the reliability of the urinalysis, and argued that Sergeant Thomas' failure to pay his billeting bills was the result of confusion and misunderstanding and was not dishonorable. Sergeant Thomas testified only as to the charge of dishonorable failure to pay the two billeting debts.

## II. ASSISTANCE OF COUNSEL

Sergeant Thomas was represented at trial by two detailed military defense counsel. One was Captain B, the area defense counsel at McGuire. The other was Captain G, a circuit defense counsel stationed at Andrews. Sergeant Thomas raises before us eight separate complaints about their performance, which he argues deprived him of his constitutional right to the effective assistance of counsel. We disagree.

▬ It is well established that an accused has a constitutional right to the effective assistance of counsel. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), *reh'g denied,*

467 U.S. 1267, 104 S.Ct. 3562, 82 L.Ed.2d 864 (1984); *United States v. Scott,* 24 M.J. 186 (C.M.A.1987). Before any relief is warranted on appellate review because of ineffective representation, an appellant must show his counsel's performance was deficient and that the deficient performance prejudiced the outcome of the case. Appellate courts give heavy deference to trial defense counsel's judgments, and "presume counsel's conduct falls within the wide range of reasonable professional assistance." *United States v. Morgan,* 37 M.J. 407, 409 (C.M.A.1993). Tactical decisions will not be second-guessed. *United States v. Sanders,* 37 M.J. 116, 118 (C.M.A. 1993).

The Court of Military Appeals has articulated a three-part analysis to resolve claims of ineffective assistance of counsel:

1. Are the allegations made by appellant true; and, if they are, is there a reasonable explanation for counsel's actions in the defense of the case?

2. If they are true, did the level of advocacy fall measurably below the performance ordinarily expected of fallible lawyers?

3. If ineffective assistance of counsel is found to exist, is there a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt?

*United States v. Tharpe,* 38 M.J. 8 (C.M.A. 1993), *citing United States v. Polk,* 32 M.J. 150 (C.M.A.1991).

### A.

▬ Sergeant Thomas first complains that his trial team failed to assure that a single attorney had overall responsibility for orchestrating the defense. We note first that if such a situation exists it may lead to deficient performance by defense counsel, but it is not itself a deficient action or failure to act that necessarily prejudices the outcome of the case. There is no indication in the record of this case that there was the kind of severe disorganization of the defense effort that would produce a "fatal breakdown in the adversarial process that our system counts on to produce

just results." *United States v. Mansfield,* 24 M.J. 611, 618 (A.F.C.M.R.1987). Furthermore, Sergeant Thomas' complaint is not supported by the record before us. The affidavits of Captain B and Captain G establish that both counsel clearly understood that the leader of the defense effort was Captain G, the more experienced trial advocate serving as a circuit defense counsel. They also establish that there was a clearly defined division of responsibility, and that counsel consulted regularly. We find no deficiency here.

### B.

■ Sergeant Thomas next complains his defense counsel failed to reasonably investigate a potential insanity defense. He says his counsel were aware he used a great deal of crack cocaine in a very short period of time, and he contends that this substance abuse should have raised the possibility that he suffered from a personality disorder, which could have formed the basis for a defense of lack of mental responsibility or might have established that he lacked the requisite mental capacity to stand trial. It also appears defense counsel knew Sergeant Thomas had previously used drugs. In his affidavit before us Sergeant Thomas says he was treated in a drug rehabilitation program and had a prior arrest for drug use. A statement written on the eve of trial and signed by Sergeant Thomas and both defense counsel says he was fired by the New York Transit Police in January 1988 for use of cocaine.

The affidavits of the trial defense counsel indicate Sergeant Thomas consistently denied using cocaine as charged. If the sole indicator of a personality disorder is drug use the accused denies, there would seem to be little purpose in requesting a mental examination.

Furthermore, even where an accused admits to using drugs, and to using them more than once, that fact is not by itself very persuasive that he has a personality disorder.[3] In this case there was evidence

of recent use on only one day, although it occurred over a period of several hours and in two locations. A defense expert consultant indicated the urinalysis results were consistent with "limited use." There was no other indication of any personality disorder in Sergeant Thomas' behavior, nor was any indication raised in the evaluations by his coworkers.

We also note that there is a conspicuous absence of any evidence before us of any post-trial mental examination or any other indication that Sergeant Thomas actually suffers from any mental disorder that a mental examination before trial would have discovered. There is therefore no reason to believe that a mental examination before trial would have changed the result in any way.

■ In these circumstances, we find no error in defense counsel's decision not to request a mental examination. Because there was no indication of any kind, other than his drug use, that Sergeant Thomas had a personality disorder, the defense argument invites us to create a "bright-line" rule that all appellants who use drugs more than once are deprived of their right to the effective assistance of counsel unless their counsel requests a mental examination. We decline to do so.

### C.

■ Sergeant Thomas next argues his counsel failed to fully inform and advise him of his right to negotiate a pretrial agreement, and misled him concerning the probable outcome of the trial. In his affidavit before us Sergeant Thomas avers that his counsel evidently believed he would be convicted, but they never communicated that to him. He further states they never tried to convince him it would be in his interest to reach a plea agreement. Both defense counsel have submitted affidavits in which they state they told Sergeant Thomas the result at trial would "almost assuredly" be conviction, at least

---

3. *See* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders,* 166–178 (rev. 3rd ed. 1980).

on the drug, paraphernalia, and absence charges. Both counsel also report they discussed several times with Sergeant Thomas the possibility of entering a pretrial agreement with the convening authority, and they engaged in preliminary discussions of a pretrial agreement with the trial counsel. Both counsel indicate Sergeant Thomas decided, contrary to their advice, to plead not guilty to the drug and paraphernalia charges.

The affidavits of counsel are detailed, positive, and consistent. They are corroborated by a written memorandum, signed on the eve of trial by Sergeant Thomas, acknowledging the damning evidence against him on the drug charge and the advice given him by counsel, and indicating that it was "wholly my decision as to the pleas, jury or judge, and whether I testify or not." Captain B avers that Sergeant Thomas spoke directly with a defense expert consultant who told him the litigation package supported the urinalysis results and there was no defense available based on innocent ingestion or taking prescription medications. In these circumstances, we find the defense counsel's affidavits more worthy of belief. Accordingly, we further find that counsel adequately advised Sergeant Thomas concerning the probable outcome of the trial and the possibility of entering a pretrial agreement. We find no deficiency in their performance in this respect.

### D.

■ Sergeant Thomas further complains his defense counsel deprived him of the right to be tried by a forum of his choice. He states in his affidavit that he initially wanted to be tried by members, but he decided to be tried by the military judge sitting alone because the judge was a reservist. He felt fellow reservists would have similar military experience and training, and might be in a better position to understand his circumstances. He contends that his counsel failed to inform him

he had a right to request that reservists be appointed as members. Both trial defense counsel agree the subject of requesting reserve members was never discussed, but their advice to Sergeant Thomas that he elect trial by military judge alone would not have changed on that basis.

An accused has the right to submit any requests he wants concerning the appointment of members, in the sense that there is no prohibition against him doing so. There is no requirement, however, that the convening authority grant any such request, except for requests for enlisted members. *See* R.C.M. 503(2). Failure of the defense counsel to inform appellant of an unenforceable right, if it is properly characterized as a "right" at all, is not deficient performance. Furthermore, we find no risk of prejudice resulting from not having reserve members on the panel. If there was something unusual about the conditions of reserve service that was relevant to the case, it could have been presented to the court as evidence.

### E.

■ Sergeant Thomas next complains his defense counsel failed to move for dismissal of the charges against him on jurisdictional grounds. The charges were preferred by a civilian, who was not a person subject to the Uniform Code of Military Justice, and was therefore not authorized to prefer charges under Article 30(a). This occurred because the accuser was an air reserve technician who was both a member of the Air Force Reserve and a civilian employee of the Air Force.[4] When called to active duty, or while performing inactive duty for training, he was a member of the military. The rest of the time he was a civilian employee. Apparently he was in civilian status when he preferred the charges against Sergeant Thomas.

This issue was before this Court in a petition for extraordinary relief brought by Sergeant Thomas asking that the findings and sentence be set aside for lack of juris-

---

**4.** *See* Air Force Pamphlet 45–20, *Information on Air National Guard and Air Force Reserve Pro-* *grams,* para. 1a(1) (June 1990).

diction. We held that the issue of the status of the accuser is procedural, not jurisdictional, and that it was waived by failure to object at trial. *Thomas v. United States*, Misc.Dkt. No. 92–19 (A.F.C.M.R. 26 January 1993), *pet. denied*, 37 M.J. 276 (C.M.A.1993). Sergeant Thomas now argues his counsel's failure to discover the accuser's status and challenge the jurisdiction of his court-martial on this basis was prejudicial error. We disagree.

There is no indication in the record that any of the parties knew of the problem with the accuser's status until after trial. Captain G's affidavit states he recalls asking Captain B and Sergeant Thomas if the accuser "was the commander at the time of preferral. Both indicated he was." The charge sheet indicates the accuser was a colonel in the 514th Military Airlift Wing, and that he signed the charges after swearing under oath that he was a person subject to the UCMJ. We are not inclined to find that counsel are ineffective when they rely on an accuser's representation that he is a member of the military unless they are aware or should have been aware of some irregularity. We conclude the fact that the commander was an air reserve technician does not put counsel on notice of any irregularity. We find no deficiency in counsel's failure to discover the accuser's status.

Furthermore, if the defense had objected at trial to the preferral, the defect could have been promptly and easily cured by preferring the charges again. Some delay might have resulted, but there is no reason to believe the outcome of the case would have been different in any way. Accordingly, even if we found counsel erred, no prejudice resulted.

### F.

Sergeant Thomas next complains that during his trial his defense counsel failed to object to (1) Ms. King's testimony concerning her identification of Sergeant Thomas during an unlawfully suggestive lineup, (2) physical evidence for which no proper foundation was laid, and (3) "scores of leading questions, incident after incident of hearsay testimony, and numerous ques-

tions calling for and receiving speculative responses." We find that an objection could have been made to Ms. King's testimony about the lineup, but that no prejudice resulted. We find no merit to the other complaints concerning counsel's failure to make objections.

■ Ms. King testified she picked Sergeant Thomas out of a lineup consisting of four male airmen conducted during the Article 32 investigation. She then said, "And he told me to pick either 1 or 4, I believe ... is supposed to be the person. And I picked Number 4, Sergeant Thomas." None of the parties asked any questions concerning this statement, which on its face raised the issue of whether the lineup was unduly suggestive. Mil.R.Evid. 321(b). Captain G states in his affidavit that he understood her to say, "[He] (the government representative at the Article 32 investigation) told me to pick any one of the four," which is what the verbatim transcript of Ms. King's testimony at the Article 32 investigation records. Captain G further states he was present at the lineup, and it was not conducted in a suggestive manner.

If the record of trial is accurate, as we must presume, all the parties missed Ms. King's remark. The defense counsel conducted no cross-examination concerning the lineup, and the military judge asked no questions concerning the lineup in his own examination of Ms. King that occupies five pages of the record. Based on the record, we find defense counsel was deficient in not conducting cross-examination of Ms. King about the lineup or objecting to the admission of this testimony. Nevertheless, we find no resulting prejudice. Ms. King spent 5 to 8 hours with Sergeant Thomas. They had sex together. When Ms. King first talked to government agents on the day of the charged offenses she knew Sergeant Thomas' name, the description of his truck, the location of his room, and the contents of his refrigerator and his trash. Cross-examination would probably have revealed that the witness misspoke, not that the lineup conducted at the Article 32 investigation was unduly suggestive. Even

if it was, it is unlikely the military judge would have found that it significantly undermined the reliability of Ms. King's identification of Sergeant Thomas at trial.

■■■■ Sergeant Thomas' complaint that his counsel failed to object to admission of the drug paraphernalia for lack of foundation is not supported by the record. The items in question (a small brown paper bag containing five plastic baggies containing cocaine residue, two plastic straws containing cocaine residue, and a used condom and wrapper of the same brand and lot number as other condoms found in appellant's room) are sufficiently unique in appearance and in their unusual association together that there was adequate foundation to admit them into evidence without formal proof of their chain of custody after seizure by government agents. R.C.M. 901(b)(4).

■■■■ Sergeant Thomas' complaints about his counsel's failure to object to leading questions are similarly without merit. It is seldom effective advocacy to raise every possible objection. Leading questions are permitted in some circumstances on direct examination; the military judge has broad discretion in application of the rule. Mil.R.Evid. 611. Leading questions are often insignificant as a practical matter, especially in a judge-alone trial. As Captain G's affidavit states, "While irritating, in a judge alone trial, such questions were not worth an objection." We find no deficient performance here.

■■■■ Similarly, we find no deficient performance in defense counsel's failure to object to hearsay or speculation contained in the testimony of witnesses called by the prosecution. It is not necessary to discuss in detail every instance cited by Sergeant Thomas. Suffice it to say that each of them concerns a matter otherwise in evidence or otherwise provable, or it appears to be admissible under an exception to the hearsay rule, or it is harmless. Mil.R.Evid. 801–806. In parsing the record closely, we might differ with the judgment of defense counsel in not objecting to certain questions or answers, but we find counsel's

performance satisfies any reasonable standard of trial advocacy. We further find no significant risk that failing to make such objections, individually or collectively, would have made any difference in the outcome of the case.

## G.

■■■■ Sergeant Thomas next complains his defense counsel failed to move for a finding of not guilty on the charge of dishonorably failing to pay two billeting debts. He argues such a motion should have been made because there was no proof on which a reasonable finder of fact could have found that his failure to pay the debts involved was dishonorable, or that his conduct was either prejudicial to good order and discipline in the armed forces or that it was of a nature to bring discredit upon the armed forces. We discuss these issues more fully later in this opinion. Suffice it to say that we find there was sufficient evidence before the military judge on both specifications that it would have been error for him to grant a motion for a finding of not guilty. We also concur with the comment in Captain G's affidavit to the effect that a motion for a finding of not guilty serves little purpose in a judge alone trial. It may even backfire by giving the government a chance to reopen its case to fill holes in the required proof. *See United States v. Collier,* 36 M.J. 501, 507–08 (A.F.C.M.R.1992), *pet. denied,* 38 M.J. 461 (C.M.A.1993). We find no deficient performance here.

## H.

■■■■ Finally, Sergeant Thomas complains his defense counsel improperly advised him not to testify on the drug charges because of an unwarranted concern that such testimony might result in the admission of potentially damaging rebuttal or impeachment evidence concerning his prior drug use. The government had possession of written records of his termination from the New York Transit Police in January 1988 because of a November 1987 urinalysis that was positive for cocaine. They also had evidence of his participation

in a drug rehabilitation program. He argues before us that if he limited his testimony to the events of 24 October 1991 there would have been no danger of creating an opening for such evidence. The affidavits of both defense counsel state they had no confidence Sergeant Thomas could testify about the drug charge without inadvertently opening the door to this evidence of prior drug use. In short, their advice was based on a tactical judgment. They advised him not to testify on the drug charges, but made it clear the decision was his alone. We find no deficiency in this advice. We also conclude that the evidence against him on the cocaine use charge was so strong that it is extremely unlikely his sworn denial of drug use would have made any difference in the outcome.

### I.

■ Sergeant Thomas next argues that actual prejudice need not be shown in some circumstances in order to claim relief because of ineffective assistance of counsel, citing *Strickland,* where the Supreme Court said, "In certain Sixth Amendment contexts, prejudice is presumed." 466 U.S. at 692, 104 S.Ct. at 2067. The Supreme Court went on to give specific examples of what it meant, however, which were (1) actual or constructive denial of the assistance of counsel altogether, (2) various kinds of state interference with counsel's assistance, and (3) some kinds of conflicts of interest. In such limited circumstances there may be a presumption of prejudice. None of them apply in Sergeant Thomas' case. He must show actual prejudice in order to warrant relief, and he has not done so. *See Cronic v. United States,* 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984).

We have evaluated each of Sergeant Thomas' complaints of ineffective representation of counsel separately, and we have also weighed their cumulative effect. Concerning all but one of these complaints, we find the trial defense counsel's representation of appellant did not fall below the performance ordinarily expected of fallible lawyers. "After a losing effort, hindsight usually suggests other ways that might have worked better; but that is not the measure of ineffective assistance of counsel." *Sanders,* 37 M.J. at 118. In the one matter where we found deficient performance—defense counsel's failure to object or inquire further into Ms King's testimony concerning the lineup—we find there is no reasonable probability that, absent this error, the factfinder would have had a reasonable doubt respecting guilt. Accordingly, we find no basis for Sergeant Thomas' complaint that he was denied the effective assistance of counsel.

### III. DISHONORABLE FAILURE TO PAY DEBTS

■ Sergeant Thomas next argues the evidence was legally and factually insufficient to support his conviction of dishonorably failing to pay two debts to the billeting offices at Andrews and McGuire. Under Article 66(c), UCMJ, a court of military review has the duty to determine not only the legal sufficiency of the evidence but also its factual sufficiency. The test for the former is whether, considering the evidence in the light most favorable to the prosecution, a reasonable fact-finder could have found all the essential elements beyond a reasonable doubt. For factual sufficiency, the test is whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, the judges of the court of military review are themselves convinced of the accused's guilt beyond a reasonable doubt. *United States v. Turner,* 25 M.J. 324 (C.M.A.1987). We find the evidence in this case was legally sufficient, but we are not ourselves convinced beyond a reasonable doubt by the evidence of record that Sergeant Thomas is guilty of these offenses. We set aside the findings of guilty of Charge IV and its two specifications.

■ The gravamen of the offense of dishonorable failure to pay just debts is a failure to pay accompanied by "deceit, evasion, false promises, or other distinctly culpable circumstances indicating a deliberate non-payment or grossly indifferent attitude

toward one's just obligations." MCM, Part IV, paragraph 71c (1984). Simple negligence is not enough to constitute this offense. *United States v. Kirksey,* 6 U.S.C.M.A. 556, 20 C.M.R. 272 (1955). No single test for "dishonorableness" exists; it depends on a weighing of all the circumstances of the individual case. *United States v. Gardner,* 35 M.J. 300 (C.M.A. 1992).

■ The circumstances in which the debt was created may be probative. *United States v. Cummins,* 9 U.S.C.M.A. 669, 26 C.M.R. 449 (1958) (misrepresentations about other indebtedness on a loan application); *United States v. Ferguson,* 29 M.J. 559 (A.F.C.M.R.1989) (accumulating amounts of debt the accused knew he would be unable to pay); *United States v. Gibson,* 1 M.J. 714 (A.F.C.M.R.1975) (creditor knew debtor was insolvent and demanded a cosignor); *United States v. Higerd,* 26 M.J. 848 (A.C.M.R.1988), *pet. denied,* 28 M.J. 81 (C.M.A.1989) (writing checks he knew he would not be able to cover); *United States v. Savinovich,* 25 M.J. 905 (A.C.M.R.1988) (accumulating debt he knew he would be unable to pay).

■ Failure to pay over a significant period of time may be probative of willful refusal to pay or of gross indifference to payment of the debt, but it is not sufficient by itself to establish that the nonpayment is dishonorable. *Gardner,* 35 M.J. at 301. Some of the circumstances that have been found relevant as proof of an accused's attitude toward payment of a debt include: denying that the debt was ever incurred *United States v. Hale,* 28 M.J. 310 (C.M.A.1989); *United States v. Atkinson,* 10 U.S.C.M.A. 60, 27 C.M.R. 134 (1958); false representations that payment has been made *Savinovich;* a deceitful promise to pay made in order to evade payment *Gibson; United States v. Andrews,* 9 C.M.R. 667 (A.F.B.R.1953); the absence of partial payments *Gardner, Ferguson, Savinovich; United States v. McCanless,* 29 M.J. 985 (A.F.C.M.R.1990); ignoring past due notices *Cummins, Higerd;* partial payment with a bad check *United States v. Robinson,* 16 C.M.R. 766

(A.F.B.R.1954); and whether the creditor is satisfied with the arrangements made by the accused for payment of the debt *Cummins; United States v. Borner,* 25 M.J. 551 (A.F.C.M.R.1986).

The military judge convicted Sergeant Thomas of both specifications of Charge IV, as follows:

1. In that [appellant], being indebted to "The Gateway Inn," Andrews Air Force Base, Maryland, in the sum of $552.00, which amount became due and payable on or about 5 November 1991, did within the territorial limits of the United States, from 5 November 1991 to 17 January 1992, dishonorably fail to pay said debt.

2. In that [appellant], being indebted to the "All American Inn," McGuire Air Force Base, New Jersey, in the sum of $1,083.98, which became due and payable on or about 18 December 1991, did within the territorial limits of the United States, from 18 December 1991 to 17 January 1992, dishonorably fail to pay said debt.

### A.

■ Respondent reported to Andrews on 28 August 1991, and remained there until he was transferred back to his unit of attachment at McGuire on 6 November 1991. By an administrative error, the Andrews billeting office "checked him out" in its records on 29 September 1991; after the error was discovered it "checked him back in" on 1 October 1991. There is no indication in the record that Sergeant Thomas was aware of these events. The erroneous record notation checking him out on 29 September generated a notice dated 30 September addressed to him stating that he owed billeting charges of $256.00. A "final notice" of this bill was sent on 31 October 1991. When these notices were sent he occupied a billeting room at Andrews. On 6 November 1991 a notice was sent notifying him that his bill for the "second half" of his stay was $296.00. All these notices were sent to an erroneous address, and there is no evidence that he ever received any of them. He testified he never got them.

An accountant from the Andrews billeting office testified its policy was that billeting bills were to be paid at checkout, except that if someone stayed longer than 15 days the bill should be paid every 15 days. There was no evidence that this policy was ever communicated to Sergeant Thomas. The government urges us to infer that he knew, but we decline to do so. First, it appears from the record that in some circumstances a Reserve member's unit pays for the member's billeting. The accountant testified that she attempted to contact Sergeant Thomas' unit to ask if this was true in this case, but that she had no success until she got through to Mr. Cook, Sergeant Thomas' civilian foreman, on 17 December 1991. Furthermore, Sergeant Thomas testified he never served on extended active duty in the Air Force, and that the one previous time he performed temporary duty he was not billed for billeting. In these circumstances we conclude there is no proof Sergeant Thomas had effective notice of his Andrews billeting bill before Mr. Cook called him in to discuss the matter on 17 December 1991.

Mr. Cook testified that on 17 December 1991, after he got the call from the Andrews billeting office accountant, he called in Sergeant Thomas and talked with him about it. Mr. Cook testified Sergeant Thomas said he knew about the two debts to Andrews billeting, one for $256.00 and one for $296.00. Sergeant Thomas said he would "take care of it," but no suspense date was established.

Sergeant Thomas testified he never got any kind of bill from Andrews billeting, and that he checked out by leaving his key with the maid. He was not sure whether he would get a bill or whether his unit would pay for his billeting. The only writing he ever got was a yellow "stickie" Mr. Cook gave him on 17 December 1991 with two sets of dates and the two figures $256 and $296 on it. He drove down to Andrews that day to speak with his defense counsel, and also stopped at the billeting office. The person he needed to see had gone for the day. He testified he called on the telephone on another occasion, but the person he needed to talk with was out. He told Mr. Cook he was having trouble getting through; Mr. Cook told him to keep trying. In mid-January his supervisor told him action had been taken to withhold the $552.00 for Andrews billeting from his military pay, at which point he felt no further action on his part was necessary. The debt was collected in full before trial.

There was a period of approximately one month between effective notice to Sergeant Thomas that the debt was owed and notification to him that involuntary collection action had been initiated. We have no reason to doubt his testimony that he made two attempts to contact the Andrews billeting office with what seem to have been good faith questions about why his uninterrupted stay in billeting was billed as two periods with a gap of several days in the middle, and whether he or his unit should be paying. Mr. Cook mentioned that Sergeant Thomas filed several travel vouchers, but none were introduced in evidence and there is no information in the record as to when, if ever, Sergeant Thomas was reimbursed for any billeting expense at Andrews.

We conclude Sergeant Thomas was inattentive to clearing up his billeting bill at Andrews. Perhaps he was negligent. We are not persuaded beyond a reasonable doubt, however, that there was any deceit, evasion, false promises, or other distinctly culpable circumstances indicating a deliberate non-payment or grossly indifferent attitude toward this obligation. Accordingly, the finding of guilty of specification 1 of Charge IV is set aside and dismissed.

### B.

■ Mr. Cook testified that on 18 December 1991 he received a call from the manager of the McGuire billeting office about a debt owed to it by Sergeant Thomas. The caller said Sergeant Thomas owed $876.00 for staying in a billeting room from 25 April 1991 to 31 July 1991, and he was accumulating additional charges as a current occupant. Mr. Cook testified he called in Sergeant Thomas again the next day. Sergeant Thomas agreed he was a current

occupant of a billeting room, but he said he thought he had stayed in the barracks from April to July, not in billeting. Sergeant Thomas said he would take care of it.

Sergeant Thomas testified that he never received any notice of any debt owed to the McGuire billeting office before a conversation with his acting first sergeant in the middle of January, when he was told action had already been taken to withhold the debt from his military pay. He said Mr. Cook was lying about notifying him of the McGuire billeting debt on 19 December. We find it unnecessary to resolve this conflict in the testimony because we conclude the lapse of 3 or 4 weeks in the circumstances of this case is not a significant time period probative of willful refusal to pay or of gross indifference to payment of the debt.[5]

There is no evidence in the record that Sergeant Thomas had any notice of this debt before Mr. Cook says he told him about it on 19 December 1991. The record gives us no information about when or if he was ever reimbursed for billeting expenses at McGuire. Under any view of the evidence less than a month elapsed between notification to Sergeant Thomas of the debt and notification that action had been taken to withhold the debt from his military pay. The debt was collected in full before trial. In these circumstances the evidence does not establish beyond a reasonable doubt there was any deceit, evasion, false promises, or other distinctly cul-

pable circumstances indicating a deliberate non-payment or grossly indifferent attitude toward this obligation. Accordingly, the finding of guilty of specification 2 of Charge IV is set aside and dismissed. Both of its specifications having been set aside, Charge IV is also set aside and dismissed.[6]

## IV. SENTENCE

 It remains to reassess the sentence in view of our action setting aside Charge IV. This Court may reassess a sentence if we are able to determine what sentence the trial court probably would have imposed if there had been no error. *United States v. Peoples,* 29 M.J. 426 (C.M.A.1990); *United States v. Crowe,* 30 M.J. 1144 (A.F.C.M.R. 1990), *pet. denied,* 32 M.J. 43 (C.M.A.1990). We believe we are able to do so in this case. We have affirmed the most serious of the charges against Sergeant Thomas, concerning cocaine use. The military judge properly found the drug paraphernalia charge to be multiplicious for sentencing with the cocaine use. He announced the maximum sentence included confinement of 11 years and 2 months. Both counsel agreed, as do we.[7]

The two specifications of dishonorable failure to pay just debts contributed 1 year to this maximum confinement. The military judge adjudged a sentence that included a bad-conduct discharge, 27 months confinement, and reduction to E–1. We have no doubt that without the findings of guilty

---

**5.** We suspect, however, that Mr. Cook may have been confused concerning the date when this conversation occurred, since he testified he counseled Sergeant Thomas on 19 December about the amount of his bill through 27 December, when the unit decided to move Sergeant Thomas into the barracks to stop the accumulation of his debt to the billeting office. Mr. Cook testified that he did not know until 27 December that this action would be taken. He could not have counseled Sergeant Thomas on 19 December concerning a debt calculation based upon it. Specification 2 of Charge IV suffers from a similar lapse of logic. It alleges there was a debt of $1083.98 due and payable on or about 18 December 1991, but it is clear from the record that this amount includes billeting charges for the period through 27 December 1991. In view of our disposition of this specifi-

cation we find it unnecessary to resolve this variance between the charge and the proof.

**6.** Our disposition of Charge IV on the basis that the evidence is factually insufficient to prove Sergeant Thomas' failure to pay was dishonorable makes it unnecessary for us to consider his argument that failure to pay a debt owed to the government is not subject to prosecution under Article 134 because it neither brings discredit upon the armed forces nor is it prejudicial to good order and discipline.

**7.** The two cocaine uses carry maximum confinement of 5 years each; the two absences of less than 3 days carry maximum confinement of 1 month each; the two dishonorable failures to pay just debts carry maximum confinement of 6 months each.

on the debt charge the military judge still would have imposed a bad-conduct discharge and reduction to E–1. He would probably have imposed somewhat less confinement, but we conclude that he would probably not have imposed less than 21 months confinement.

Accordingly, we approve only so much of the sentence as provides for a bad-conduct discharge, confinement for 21 months, and reduction to E–1. We have given individualized consideration to the appropriateness of the sentence, weighing the nature and seriousness of the offenses, the character and military performance of appellant, and all the circumstances documented in the record of trial. *United States v. Snelling*, 14 M.J. 267 (C.M.A.1982). We find the sentence, as reassessed, is not inappropriate.

Charge IV and its specifications are set aside and dismissed. The remaining findings of guilty and the sentence, as reassessed, are correct in law and fact and, on the basis of the entire record, are

AFFIRMED.

Judges HEIMBURG and YOUNG concur.